# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47007-1-II |
| Respondent, | |
| v. | |
| JAYCEE FULLER, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Jaycee Fuller, a self-represented litigant at trial, appeals his convictions for felony murder in the first degree and premeditated murder in the first degree. We conclude that the trial court did not abuse its discretion by admitting evidence or by denying Fuller's motion to dismiss. We decline to review Fuller's unpreserved argument regarding a Tweet from the prosecutor's office's Twitter[1] account. Finally, we conclude sufficient evidence supports Fuller's convictions. We affirm.

---

[1] Twitter is a social networking platform. It gives people a vehicle to express themselves online in short soundbites called "tweets" that are limited to 140 characters. By default, any Twitter user can sign up to "follow" any other Twitter user, which means Twitter will cause the follower to receive all tweets the author publishes. When an author publishes tweets, he's often publishing them to a wide audience, and he often has no personal connection with most members of that audience. *Nunes v. Twitter, Inc.*, No. 14-CV-02843-VC, 2016 WL 3660526, at *1 (N.D. Cal. July 1, 2016).

FACTS

I.     CRIME SCENE

In the early morning of March 8, 2009, police responded to a crime scene near South Tacoma Way in Tacoma.  Police found a King Cab Taxi cab stopped in the road near a parking lot, at the end of a slope.  The cab and the meter were still running.  Based on the tire tracks, it appeared to the officers that the cab came from a nearby parking lot.  The cab driver, Muhamed Ahmed, was deceased when police arrived.  Officers found him face down next to the cab with his left arm tangled in the seatbelt.  Ahmed sustained two knife-like or sharp-force injuries to the neck.

Police found a one dollar bill and a "King Cab" business card on the right rear floorboard of the cab.  Report of Proceedings (RP) (Nov. 3, 2014) at 91, 145.  The center console appeared to be broken or torn back.  The police found a wallet, a cell phone, credit cards, and personal papers in the center console which appeared untouched.  The crime scene technicians did not recover finger prints of value from inside the cab.

Inside Ahmed's right interior jacket pocket, the police found $160.  The bills were blood stained.  They found an additional $49 in Ahmed's left interior jacket pocket and an additional $5 in the visor of the cab.  According to another cab driver, cab drivers frequently kept money in several different places inside the vehicle in case someone tried to rob them.

The police found a charcoal grey beanie cap in the parking lot in close proximity to the cab.  It was black with a white stripe and had a "Keg Steakhouse" restaurant logo on the front.  RP (Nov. 4, 2014) at 19; RP (Nov. 6, 2014) at 329.  It also had a small amount of what appeared to be blood on it.  One detective found a long hair, 10.5 to 11 inches long, inside the cap.

Police observed several different blood patterns within the cab, generally coming from the driver's seat. These patterns indicated movement coming from the front driver's seat and, "to a lesser extent," the left rear seat. RP (Nov. 3, 2014) at 153. The rubber floor mat under the driver's seat was also "a little askew" and seemed to be the only other item "out of place" in an otherwise "very neat, very clean, very tidy" cab. RP (Nov. 3, 2014) at 153-54. From these facts, it appeared that an attack took place inside the vehicle while Ahmed was in the driver's seat and the attacker was in the rear left seat.

The trial court admitted a video and photographs of the crime scene. In part, they showed indentations, made in bark, in the hillside on the perimeter of the scene. Nobody took shoe impressions because the impressions lacked detail and were distorted because of the bark. Only the general shape of the indentations was visible. The police did take measurements of them.

A detective observed impressions in the hillside, covered in "beauty bark," that appeared to be foot impressions of someone who had "bounded down the beauty bark." RP (Nov. 4, 2014) at 15. He observed two deep impressions at the top of the hillside and another two lower down. The impressions below the retaining wall measured approximately 13 inches each. No measurements of the impressions on the hillside were taken because they were "so disturbed." RP (Nov. 4, 2014) at 16. The detective opined that it looked as though the person who made the impressions jumped off the retaining wall to a lower area which was also covered in beauty bark. The indentations were only 20 feet away from the beanie cap, along the easiest point of egress. The detective opined that a person out for a walk would not likely jump from a 10 foot retaining wall.

II.    INVESTIGATION

A.    Ahmed and His Cab

Ahmed, a 22-year-old, came to the United States from Somalia as a refugee in 2005. He drove a cab for King Cab Taxi and took English as a second language classes. On the day Ahmed died, he had worked roughly 10 hours and took 14 fares. No one knew how much money Ahmed had when he started his shift or precisely how much Ahmed made from his fares.

Ahmed's cab was equipped with a "panic button" the driver could press if trouble arose. RP (Nov. 4, 2014) at 95. Ahmed did not push the panic button during his last fare on March 8.

The cab's last known route was captured by the vehicle's GPS (Global Positional System). It showed that a passenger flagged Ahmed's cab on the street, near Masa, a bar on Sixth Avenue. A map of the route Ahmed took was admitted at trial. It showed that he left Masa, went past the El Popo Apartments, went down South Tacoma Way, briefly drove down Alder Street, continued onto 36th Street, and turned onto Lawrence Street, where the cab stopped. The trip began at 3:05 A.M. and the cab stopped moving at 3:17 A.M.

South Alder Street was not a commonly used road because it was bumpy and only partially paved but was frequently used by Yellow Cab Company drivers because it provided easy access to Yellow Cab from South Tacoma Way.

Police obtained video footage of the area around Masa on Sixth Avenue the morning of the murder. One video recording showed Ahmed's cab pulling to the curb at about 3:05 A.M. An individual walked past Masa. Video footage from Anthony's Trucking also showed what appeared to be the cab turning onto Alder Street and then a cab continuing on the route shown by GPS.

In addition to Ahmed's cab, the video footage from the outside of Masa showed a white male. He appeared to be in his late twenties or early thirties, approximately 6 feet tall, weighing approximately 200 pounds, wearing dark clothing, heavy footwear, and a black stocking cap with a white stripe around the base of it and a logo on it. The individual had a long dark ponytail and facial hair. The cap he was wearing appeared to match the one found at the scene.

B.      Connection to Fuller

Fuller had worked at the Keg Steakhouse as a dishwasher. An employee at the Keg Steakhouse informed a detective that the beanie cap found in the parking lot was not publically available; employees had received the beanie at a Christmas party in 2006 or 2007. Fuller received one of the caps. Fuller had worked at the restaurant as a dishwasher and also drove a cab for the Yellow Cab Company that would occasionally pick up people from the restaurant. Fuller had long hair, past his shoulders, that he often wore in a ponytail, and was of medium build.

Officers also obtained video from a Pawn X-Change on Sixth Avenue from a few days before Ahmed's murder where Fuller pawned some of his property. The lead detective compared the Masa video of the individual walking past the bar and the Pawn X-Change video which he knew showed Fuller. The detective found the man in the Pawn X-Change video and man in the Masa video had similar heights, weights, general builds, clothing, gestures, and movements. A forensic video analyst opined that clothing Fuller was wearing in the Pawn X-Change video was not inconsistent with the clothing the man was wearing in the Masa video. The analyst also opined that the man in both the videos appeared to have light skin, a mustache, and possibly a long ponytail.

At the time of the incident, Fuller lived at the El Popo Apartments which were northwest of the crime scene. Fuller was evicted from the El Popo Apartments at the end of March 2009 for not paying rent.

Fuller had previously worked for the Yellow Cab Company and was fired about three months before Ahmed's murder. Fuller then worked for another cab company in January 2009 for a few weeks. That job ended because Fuller could not pay the lease on the cab. While working for Yellow Cab, Fuller's hair was long and worn in a ponytail and he often wore a charcoal grey beanie cap from the Keg. Fuller told the operations manager that he carried a knife for protection and that he did not like foreigners or immigrants coming to America and taking American jobs.

Around March 9, while being evicted, Fuller moved in with a friend, Heather Staley. He had a shaved head and scratches on his face. Fuller told Staley he shaved his head because he was looking for a job. Staley stated that Fuller regularly carried a knife.

After living with Staley, Fuller moved in with Curtis Alms and Lucretia Randle. Alms and Randle knew that Fuller prided himself on his long hair, yet at the time Fuller moved in, he had a shaved head. Fuller told Alms he cut it to join the Navy SEALs. Fuller also told Alms and Randle that he lost his Keg cap when he jumped out a third floor window and cut himself. Randle stated that Fuller had also told her that he lost the cap within days of receiving it. Randle stated that Fuller brought up the cab murder and that people at his work were joking and saying it was him and that it was his cap. Alms knew Fuller regularly carried a knife.

Fuller told Alms and Randle that he hated King Cab because they only hired foreigners and would not hire him. Alms testified that he and Fuller went to Fuller's El Popo apartment to get more of his belongings. They picked up more of Fuller's clothes, some furniture, and "a bunch of knives, swords, [and] daggers." RP (Nov. 12, 2014) at 82.

6

C.      Search Warrant Evidence

The police put Fuller under surveillance between March 19 and April 2.  On April 2, 2009, police searched the El Popo Apartments trash that was in a garbage truck on route to the dump and found mail with Fuller's name on it, an identification card and prescription document with Fuller's name on them, cut hair in a plastic bag, a lot of bills, and two newspapers from March 9 and March 10 that had front page articles about Ahmed's murder.  The hair was between 12 and 16 inches in length.  The newspapers did not have identifying information but were in close proximity to the other items.

Police also executed a search warrant on Fuller's El Popo apartment on April 2.  There, the police seized hair from the bathroom.  The laboratory technicians examining the hair found in the garbage and in Fuller's bathroom determined that it was human head hair that was suitable for mitochondrial DNA[2] testing, but not nuclear DNA testing, because the hair lacked roots.  The technicians then analyzed the hair to compare to other samples.  The hair was sent to another private out-of-state forensic laboratory for mitochondrial DNA testing.

An out-of-state forensics laboratory also was sent a buccal swab from Fuller and the profiles created by the first laboratory.  The out-of-state laboratory developed DNA profiles.  The analyst found that Fuller could not be excluded as a contributor to the hair from the landfill, the bathroom, or the beanie cap and that the profiles were consistent with each other.  She found that the profile was rare.

---

[2] Deoxyribonucleic acid.

The Washington State Patrol Crime Laboratory tested the blood on the outside and the DNA on the inside of the beanie cap. The blood was a mixture of DNA from more than one person. The "major part of the profile" was a match to Ahmed but the minor part could not be conclusively determined. RP (Nov. 10, 2014 pm) at 66.

The DNA profile created from the sample collected from the inside of the beanie cap matched Fuller's DNA. The statistical probability of selecting an unrelated individual at random from the United States population with a matching profile was one in 440 trillion, and the sample from the cap appeared to come from a single source. There was also evidence that Fuller had fingernail scratches on his face. The crime laboratory tested fingernail clippings from Ahmed but found only that they were covered with blood.

The laboratory also tested swabs taken from the cab's left rear door handle of the cab. The DNA profile was a mixture of at least three people. Neither Ahmed nor Fuller could be excluded from the profile as possible contributors.

The police seized two pair of size thirteen boots related to Fuller. The detective who investigated the crime scene believed the heel in the bark indentation was consistent with the boots.

D.      Charges and First Trial

The State charged Fuller with felony murder in the first degree and premeditated murder in the first degree. Robbery or attempted robbery in the first degree constituted the predicates for the premeditated murder. Both charges carried a deadly weapon sentencing enhancement. A jury found Fuller guilty of both charges and Fuller appealed. *See State v. Fuller*, 169 Wn. App. 797, 811, 282 P.3d 126 (2012). We reversed the convictions and remanded to the trial court. *See Fuller*, 169 Wn. App. at 836. The State charged the same counts with deadly weapon enhancements in Fuller's second trial.

8

III.    SECOND TRIAL

A.    Pretrial Motions

In Fuller's second trial, Fuller represented himself with standby counsel.  To prepare documents, Fuller, who was in custody, drafted documents and sent them to his mother who would type them.  Fuller's mother is not an attorney.

On September 4, 2013, Fuller told the trial court that his mother was helping him with legal research and was typing his motions.  She used the mail system and marked her work "legal."  RP (Sept. 4, 2013) at 9.  Fuller raised concerns that the jail mail room opened his mail marked "legal."  RP (Sept. 4, 2013) at 9.  Fuller filed a motion regarding the issue.

Fuller also filed a pretrial motion asserting prosecutorial misconduct.  He argued that the Pierce County Prosecutor, Mark Lindquist, improperly discussed Fuller's case with the media.  He argued Lindquist should be disqualified from prosecuting his case.  However, Fuller conceded that a year had passed since the news last mentioned his case.  The trial court denied the motion to disqualify Lindquist.

On September 24, Fuller filed an additional motion seeking sanctions against the State.  He alleged that the jail officers were sharing his legal mail with the prosecutor's office.  Fuller included affidavits that stated an officer took the mail Fuller's mother had sent him.  This mail included hand written pages and blank paper.  Inmates could not receive blank paper, so the officers placed it with Fuller's property.  According to an officer, Fuller argued and refused to wait patiently while the officer reviewed the mail.  Fuller included a declaration, signed by other inmates, that he was cooperative.  The officer ultimately sent Fuller to lockdown and filed an incident report.  Fuller asserted that he did not receive his mail for 19 hours.

The trial court held a hearing on October 1. Sergeant Cathy Miller stated that the jail only searched mail for contraband and did not make copies or pass mail along to the prosecutor's office unless there was cause, such as contacting a witness. When Fuller discussed the mail issue, he agreed that since the jail had complied with his request after his complaint, he did not see the need for a court order.

The court asked Fuller if he was withdrawing the motion. Fuller asked if that would impact preserving the issue, and the court responded it would not prevent him from arguing it "at some future point in time." RP (Oct. 1, 2013) at 15. Fuller then withdrew the motion.

On March 14, Fuller filed a CrR 8.3(b) and (c) motion to dismiss based on insufficient evidence and governmental misconduct relating to the mail and the media incidents. During argument on his motion, Fuller stated that the information he sent to and received from his mother relating to the case involved strategy and included privileged work product. He continued to assert that the jail gave copies of the information to the prosecutor's office.

Fuller explained that he had been trying to keep in touch with his girlfriend by writing her. His attorney at the time provided Fuller with information that could only have been contained in a letter to his girlfriend. Based on this fact, Fuller argued that the jail was providing copies of his mail to the prosecution. Fuller also brought in pieces of his mail to show the court that the mail had been ripped open and had "not legal mail" written on the envelopes. RP (March 27, 2014) at 124.

Fuller also argued that the prosecutor's office violated his right to a fair trial by disclosing too much information to the media. He asserted that articles with incorrect information about his case still existed on the internet. He conceded that the State could release information to the media

10

but that it must be admissible and not prejudicial to the case. He argued that the State had made statements that "amount[ed] to an ongoing violation" of his rights. RP (March 27, 2014) at 131.

The trial court denied Fuller's motions.[3] It directed the State to "make sure they comply with the Rules of Professional Conduct [PRC] in making any statements about [the] case." RP (March 27, 2014) at 146.

Fuller also moved the trial court to exclude photographs depicting indentations in the bark. He argued that the photographed footprints measured "roughly 13 inches, not over 13 inches," and the prints were unidentifiable as shoe or boot prints. RP (Oct. 28, 2014) at 138. He also argued that the photographs prejudiced him because they created a false link between the prints and the crime. The court reserved ruling.

B.      Media Coverage—Twitter

During jury selection the court asked potential jurors if they had heard about the case. Five potential jurors disclosed that they had heard about it in the news but that it would not affect their judgment. On the second day of jury selection, the court again asked the potential jurors whether any of them had heard of the case and encouraged them to not try to recall anything more if they did end up on the jury. The trial court also reminded the jurors several times throughout the trial that they should not seek out or view any media on the case.

---

[3] Fuller later asked the trial court to reconsider its decision, apparently without filing a motion to reconsider. The trial court denied the motion to reconsider. Fuller sought discretionary review. We denied review. Fuller again moved to dismiss the charges prior to trial and again argued before the court that there was insufficient evidence. The trial court denied this motion as well.

On November 12, during trial, Fuller brought to the court's attention one specific Tweet from the prosecutor's office. Fuller said the Tweet read, "[T]he Pierce County Prosecutor Mark Lindquist to deliver opening statement tomorrow."[4] RP (Nov. 12, 2014) at 5-6. It also stated, "Fuller killed taxi driver on Tacoma's Sixth Avenue." RP (Nov. 12, 2014) at 6. Fuller argued that this message was a direct opinion on his guilt.

Lindquist responded that the office is a "public agency" and it has a public information employee who informs the public of the work his office does. RP (Nov. 12, 2014) at 6. He also stated that the trial court had already instructed the jurors to avoid the media. Fuller informed the court that he was not making a motion but believed a more proper Tweet would have included the word "allegedly." RP (Nov. 12, 2014) at 8. Fuller presented no evidence that any juror had seen the Tweet. The trial court ruled that the word "allegedly" might have been better, but that the Tweet did not violate the RPCs. RP (Nov. 12, 2014) at 8.

C.      Indentation Evidence

When the State presented the video of the crime scene, Fuller objected, claiming it would take too long to show the video. The court overruled the objection. Fuller did not object again to the playing of the video. Fuller did object on the basis of relevance when the State offered a photo of the indentations in the bark. The court overruled this objection also.

After the first week of trial, Fuller moved to exclude testimony about the indentations in the bark. He appeared to assert that the evidence was speculative, inconsistent, and irrelevant. The court denied the motion.

---

[4] The tweet actually said, "Prosecutor Mark Lindquist to delivery opening statement tomorrow on Jaycee Fuller murder trial. Fuller killed taxi driver on Tacoma's Sixth Avenue." RP (Nov. 12, 2014) at 7.

IV.     JURY VERDICT & SENTENCING

The jury found Fuller guilty of felony murder in the first degree and premeditated murder in the first degree. It also found the deadly weapon enhancement for both counts.

At sentencing, Fuller filed a motion to arrest judgment, arguing the jury lacked substantial evidence to convict him. The court denied the motion as to both counts. The court then merged the felony murder and premeditated murder counts. Fuller continued to assert his innocence throughout sentencing. The court sentenced him to 280 months of incarceration, with an additional 24 months for the deadly weapon enhancement, and 36 months of community custody. The court also imposed mandatory legal financial obligations and the requested $7,436 restitution, with credit for what had already been paid. The court found Fuller indigent.

Fuller appeals.

ANALYSIS

I.     BARK INDENTATION EVIDENCE

Fuller argues the trial court abused its discretion by admitting testimony about indentations in bark near the crime scene. We disagree.

A.     Standard of Review

A self-represented defendant is held to the same standards as an attorney. *State v. Sullivan*, 143 Wn.2d 162, 178, 19 P.3d 1012 (2001); *see also State v. Smith*, 104 Wn.2d 497, 508, 707 P.2d 1306 (1985). A party who failed to obtain a final ruling on a motion in limine before or during trial after a trial court issued a tentative ruling, has waived any objection to the exclusion of the evidence. *State v. Riker*, 123 Wn.2d 351, 369, 869 P.2d 43 (1994).

A party must object to the admission of evidence as soon as he knows the basis of the objection and at a time when the trial court could correct the alleged error. *State v. Leavitt*, 49 Wn. App. 348, 357, 743 P.2d 270 (1987), *aff'd*, 111 Wn.2d 66, 758 P.2d 982 (1988). An objection that does not specify the particular ground on which it is based is insufficient to preserve the matter for review, and it is waived. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1192 (1985). A defendant cannot argue for reversal based on an evidentiary rule not raised at trial. *State v. Powell*, 166 Wn.2d 73, 82, 206 P.3d 321, 327 (2009).

B.      Failure to Object

Pretrial, Fuller moved the trial court to exclude photographs depicting indentations in the bark. The court reserved ruling. During trial, Fuller objected to the admission of the photographs on the basis of relevance. On appeal, Fuller claims the trial court erred by admitting testimony about the indentations, but he does not claim the admission of the photographs was error.

During three days of trial, Fuller did not object to testimony on direct and cross-examination about the bark indentations. Only after the first week of trial did Fuller move to exclude testimony about the indentations in the bark. The court denied the motion.

Below, Fuller objected to the admission of the *photographs* based on relevance. On appeal, he does not revisit this objection and solely addresses the *testimony* regarding the indentations. We conclude that Fuller did not preserve the issue for review; therefore, we need not address his argument regarding abuse of discretion.

II.      GOVERNMENT MISCONDUCT

Fuller argues that the State violated his work product privilege and improperly commented on his case in the media. We disagree.

14

A.     Jail Mail

Fuller argues that as a self-represented defendant, his research, strategy, thoughts about the case, interview notes, and draft motions constituted privileged work product. As such, he contends the State, through the conduct of the jail, violated the privilege by opening his mail marked "Legal Mail" and either reading it or copying it. Br. of Appellant at 29. We disagree.

Before we address Fuller's argument, we first consider the State's contention that Fuller's argument is not preserved for review. The State seems to suggest that the trial court made a tentative ruling because it agreed to consider more facts about the jail mail situation. However, after Fuller presented facts to support his motion to dismiss, the trial court determined they were insufficient to find misconduct. The trial court then denied the motion. The trial court's ruling is preserved for review and we review the issue on the merits.

CrR 8.3(b) provides that "[t]he court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." To support dismissal under CrR 8.3(b), a defendant must first demonstrate arbitrary action or governmental misconduct. *State v. Garza*, 99 Wn. App. 291, 295, 994 P.2d 868 (2000).

"'[D]ismissal of charges is an extraordinary remedy available only when there has been prejudice to the rights of the accused which materially affected his or her rights to a fair trial.'" *Garza*, 99 Wn. App. at 295 (quoting *City of Seattle v. Orwick*, 113 Wn.2d 823, 830, 784 P.2d 161 (1989)). We review the trial court's decision to deny a motion to dismiss under CrR 8.3 for abuse of discretion. *State v. Kone*, 165 Wn. App. 420, 433, 266 P.3d 916 (2011). We consider whether the decision was manifestly unreasonable, based on untenable grounds, or made for untenable reasons. *Kone*, 165 Wn. App. at 420.

Fuller does not clearly state what government conduct he challenges. He references the instances when the jail confiscated his mail for 19 hours and when the State made a copy of his mail on one occasion. Fuller also states, "jail personnel were aware the mail was confidential and deliberately marked it 'Not' Legal Mail, opened and read mail that was marked as legal mail." Br. of Appellant at 32.

Fuller raised his concerns about his jail mail several times before the trial court. During these instances, Fuller provided no evidence that the jail did anything other than inspect the mail for contraband and return the mail to him. The record does not indicate the jail committed any wrongdoing. *See Garza*, 99 Wn. App. at 301 (jail inspecting inmate legal mail within limits is permissible to address security concerns); *see also Wolff v. McDonnell*, 418 U.S. 539, 576-77, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) (opening legal mail in presence of inmates, without reading it, accommodates prison's security concerns while protecting inmates' right to private communications with attorneys).

Fuller asserts that the trial court applied the wrong legal standard to determine whether his work product privilege was violated. However, we need not decide whether papers containing legal writing received by or sent to a self-represented defendant who is communicating with a non-lawyer for purposes of his defense are work product. Because Fuller did not present evidence that the government violated his rights, the trial court did not abuse its discretion by denying the motion to dismiss.

B.      Twitter Comment

Fuller argues the State committed misconduct by tweeting a statement about his guilt which violated the RPCs. Because this issue is not preserved for review, we do not review it.

16

As a threshold issue, the State again argues that Fuller's argument is not preserved for review because Fuller did not make a motion or object below. Fuller's briefing focuses solely on the November 2 Tweet from the prosecutor's office referencing Lindquist's opening statement.

Pretrial, Fuller filed a motion asserting that Lindquist committed prosecutorial misconduct by discussing Fuller's case publically in the news and asking that the trial court disqualify Lindquist. Also, in addition to his jail mail arguments, Fuller's CrR 8.3(b) motion asserted that the prosecutor's office committed misconduct by improperly discussing his case in the media. This motion was prior to the November 2 Tweet from the prosecutor's office. In the middle of the trial, Fuller brought the November 2 Tweet to the court's attention. Fuller advised the court that he was not making a motion but meant to inform it that a more proper Tweet would have included the word "allegedly." RP (Nov. 12, 2014) at 8. He also reiterated near the end of trial that he was not bringing a motion but advising the court about the State's media presence.

Generally, an appellant may not raise an argument on appeal that he or she did not present to the trial court. *State v. Lazcano*, 188 Wn. App. 338, 355, 354 P.3d 233 (2015), *review denied*, 185 Wn.2d 1008 (2016). We conclude that Fuller did not preserve the prosecutorial misconduct issue by filing his pretrial prosecutorial misconduct motion because it addressed a different issue than the one before us. The pretrial motion did not address whether the State commented on his guilt but focused on an article from a year prior. However, Fuller presents this issue as prosecutorial misconduct.

Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). "'A '[f]air trial" certainly implies a trial in which the attorney representing the state does not throw the prestige of his public office . . . and the expression of his own belief of guilt into the scales against the

accused.'" *Glasmann*, 175 Wn.2d at 704 (quoting *State v. Monday*, 171 Wn.2d 667, 677, 257 P.3d 551 (2011) (alteration in original)). We may review manifest errors affecting a constitutional right. RAP 2.5(a)(3). "'Manifest' . . . requires a showing of actual prejudice." *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007) (quoting *State v. Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591 (2001)). Because the issue was not otherwise preserved, Fuller must show that the alleged prosecutorial misconduct affects his constitutional rights. RAP 2.5(a)(3).

Fuller contends that the State committed misconduct when it disregarded the trial court's admonishment and issued a Tweet commenting on his guilt. In order to prevail on a claim of prosecutorial misconduct, a defendant is required to show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). To show prejudice an appellant must show a substantial likelihood that the misconduct affected the jury verdict. *Thorgerson*, 172 Wn.2d at 442. Both RAP 2.5(a)(3) and a prosecutorial misconduct claim, require a showing of actual prejudice.

Fuller cannot establish prejudice and therefore, his argument is not preserved for review under RAP 2.5(a)(3). He compares his case to that in *State v. Charlton*, 90 Wn.2d 657, 585 P.2d 142 (1978). In that case, the prosecutor commented on Charlton's guilt in front of the jury during closing argument. *Charlton*, 90 Wn.2d. at 660-61. Here, there is no evidence in the record that any of the jurors saw the Tweet. Furthermore, because the case had been tried previously and covered in the media, the trial court repeatedly reminded the jury to avoid media sources and focus only on the evidence presented during the trial. We also presume jurors follow the court's instructions. *State v. Kalebaugh*, 183 Wn.2d 578, 586, 355 P.3d 253 (2015). Because Fuller cannot show that he was prejudiced, we do not consider the issue.

18

III.     INSUFFICIENT EVIDENCE

Fuller argues that insufficient evidence supported the jury's guilty verdicts. We disagree.

A.      Standard of Review

The State is required to prove all elements of a crime charged beyond a reasonable doubt. *State v. Colquitt*, 133 Wn. App. 789, 796, 137 P.3d 892 (2006). The substantial evidence standard is satisfied where there is sufficient evidence from which the jury could rationally find the defendant guilty beyond a reasonable doubt. *State v. Ng*, 110 Wn.2d 32, 48, 750 P.2d 632 (1988). "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

"A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). Credibility determinations are for the trier of fact and are not subject to review on appeal. *State v. Prestegard*, 108 Wn. App. 14, 23, 28 P.3d 817 (2001). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *Prestegard*, 108 Wn. App. at 23. The trier of fact may reject even uncontested testimony as not credible as long as it does not do so arbitrarily. *Prestegard*, 108 Wn. App. at 23.

Where "the inferences and underlying evidence are strong enough to permit a rational fact finder to find guilt beyond a reasonable doubt, a conviction may be properly based on 'pyramiding inferences.'" *State v. Bencivenga*, 137 Wn.2d 703, 711, 974 P.2d 832 (1999) (quoting 1 CLIFFORD S. FISHMAN, JONES ON EVIDENCE: CIVIL AND CRIMINAL § 5.17, at 450 (7th ed. 1992)). Inferences

drawn from circumstantial evidence "must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

      B.     Felony Murder in the First Degree

Fuller argues that the State presented insufficient evidence to prove he committed robbery or attempted robbery, the predicate felonies for the felony murder conviction.

To convict Fuller of felony murder in the first degree, the jury had to find that Fuller committed or attempted to commit robbery in the first degree, and in the course of or in furtherance of that crime, caused the death of Ahmed in the State of Washington. RCW 9A.32.030(1)(c). A defendant commits the crime of robbery in the first degree when in the commission or immediate flight from the robbery he is armed with a deadly weapon. RCW 9A.56.190, .200. And, a defendant commits the crime of attempted robbery in the first degree when he, with intent to commit robbery in the first degree, does any act which is a substantial step toward commission of that crime.

Fuller contends that the State presented no evidence of robbery or attempted robbery. We disagree. When viewing the evidence in the light most favorable to the state, clear evidence of motive, opportunity and intent existed. Ahmed picked up a passenger in front of Masa and an individual who looked similar to Fuller was nearby at the time. The police recovered Fuller's DNA evidence from the crime scene. Fuller lost his job, pawned his belongings, and faced eviction from his residence. Ahmed did not press the panic button in his cab and Fuller, a former cab driver, had knowledge of the security systems in a cab.

Ahmed suffered a knife-like wound on the front of his neck and multiple sharp-force injuries to his right hand. The blood patterns within the cab indicated movement coming from the driver's seat and the seat directly behind it. The meter and vehicle were still running when the

police arrived. And, the money on Ahmed's person was covered in blood and there was a one-dollar bill on the floorboard. Cab drivers hide money in various places in their cabs. Nobody knew how much money Ahmed collected on this shift, but he certainly could have collected more money than the police recovered. Fuller often commented on his dislike of foreigners. Circumstantially, when viewing the evidence in the light most favorable to the state, a reasonable jury could have reasonably inferred that a struggle occurred over the cash in the cab and that the neck wounds showed the use of force to take or try to take money.[5]

Viewing the evidence in the light most favorable to the State and giving equal weight to circumstantial and direct evidence, we conclude that a reasonable jury could have found all of the elements of the crime beyond a reasonable doubt.

C.     Premeditated Murder in the First Degree

Fuller also argues that the State presented insufficient evidence to prove he committed premeditated murder in the first degree.

To convict Fuller of premeditated murder in the first degree in this case, the jury had to find that Fuller intended to cause the death of Ahmed, that the intent was premeditated, that Ahmed died as a result of Fuller's acts, and that the crime occurred in the State of Washington. RCW 9A.32.030(1)(a).

In addition to the evidence already mentioned above, the State presented evidence that the crime took place very near where Fuller lived. The route Ahmed took went past the El Popo Apartments and used a road that was infrequently used but commonly taken by Yellow Cab drivers. Fuller mentioned to several people that he hated King Cab (Ahmed's employer) because

---

[5] Fuller asserts that the lead detective stated there was not an indication of a robbery. However, Fuller misstates the evidence. The detective's testimony specifically testified nothing in the cab pointed to "a successful" robbery. RP (Nov. 6, 2014) at 363

they only hired foreigners and they would not hire him. He also told several people he did not like foreigners or immigrants taking American jobs. The medical examiner testified that the wound to the right side of Ahmed's neck caused the death and that the sharp-force injury to this abdomen likely occurred afterwards because of blood loss.

Fuller asks us to look at the evidence in the light most favorable to him, rather than the State. Viewing the above evidence along with the rest of the evidence presented in the light most favorable to the State, we conclude that sufficient evidence supported the jury's verdict.

IV.     APPELLATE COSTS

Fuller argues that we should not impose costs on appeal because he is indigent and does not have a present or future ability to pay such costs. We agree.

We consider the issue of appellate costs in a criminal case during the course of appellate review when the issue is raised in an appellant's brief. *State v. Sinclair,* 192 Wn. App. 380, 389-90, 367 P.3d 612 (2016), *review denied*, 185 Wn.2d 1034 (2016). The award of appellate costs by an appellate court is discretionary. *Sinclair,* 192 Wn. App. at 385-86. In using our discretion, we make an individualized inquiry in the review of appellate costs. *Sinclair,* 182 Wn.2d at 391. We presume a party remains indigent throughout the review, unless the trial court finds that the party's financial condition has improved. RAP 15.2(f).

At sentencing, the trial court found Fuller indigent and an order of indigency was entered. It was established at trial that Fuller lost his job as a driver with Yellow Cab three months prior to the murder, and that he previously worked as a dishwasher at the Keg Restaurant. He was also evicted from his apartment, pawning his belongings, and staying with friends until his arrest. Fuller was sentenced to 304 months of confinement. Mandatory legal financial costs and restitution were also imposed.

The State argues that the record shows that Fuller is "an able-bodied man who demonstrated a capacity for gainful employment." Supp. Br. of Resp't at 3. The State further argues that ability to pay is not an indispensable factor in considering imposing costs, and prison-based indigency for murder should not be a barrier to appellate costs. However, no showing has been made that Fuller's financial condition has improved or is likely to improve upon release. We exercise our discretion and waive appellate costs.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Worswick, J.

_____
Maxa, A.C.J.