[Nos. 64422-0-I; 64423-8-I.    Division One.    December 12, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. MOHAMMED J.L. KONE, *Appellant*.

*Casey Grannis* (of *Nielsen, Broman & Koch PLLC*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Dennis J. McCurdy, Deputy*, for respondent.

¶1 SCHINDLER, J. — A jury convicted Mohammed J.L. Kone of rape in the second degree of A.C. and attempted rape in the second degree and indecent liberties of A.B. Kone contends he is entitled to dismissal of the conviction of attempted rape in the second degree and indecent liberties because the trial court erred in denying his motion to dismiss under CrR 8.3(b). Kone asserts he is entitled to reversal of the conviction of rape in the second degree because the trial court erred in admitting evidence of prior consistent statements. Kone also asserts the court violated double jeopardy by failing to vacate the indecent liberties conviction, and erred in imposing a number of community custody conditions. We affirm the conviction of rape in the second degree of A.C. and attempted rape in the second degree of A.B. but remand to vacate the indecent liberties conviction and strike the community custody condition that prohibits access to the Internet and requires payment of counseling fees.

## FACTS

*Rape in the Second Degree of A.C.*

¶2 On June 26, 2007, A.C. met Mohammed Kone while waiting at a bus stop near the QFC grocery store in Des

Moines. Kone asked A.C. if she wanted to "go have a couple of beers at the park" near his house. A.C. agreed. Kone and A.C. took the bus to get to West Fenwick Park. Before going to the park, Kone purchased beer and wine. After drinking some beer and wine, Kone and A.C. walked to his house. Kone lived downstairs and his brother lived upstairs.

¶3 At the house, Kone became sexually "aggressive" and told A.C. he wanted to have sex with her. Kone grabbed A.C.'s breasts and her vaginal area, and told her to take her pants off. When A.C. said, "[T]hat's not going to happen," Kone got angry. Kone removed A.C.'s pants and repeatedly hit her on the buttocks with a paddle. A.C. was "screaming telling him to stop." After forcing A.C. to get on her knees, Kone digitally penetrated her anus and then her vagina.[1] A.C. went to the bathroom and locked the door, and tried to escape out the bathroom window. But Kone was standing outside. After Kone pushed her back inside, A.C. ran to the front door to escape, but Kone stopped her. Kone then hit A.C. again with the paddle and called her a "bad girl." Shortly thereafter, A.C. was able to climb out the bathroom window and run to a neighbor's house. Kone chased after her, yelling at her to stop.

¶4 Wearing only a T-shirt and underpants, A.C. pounded on the neighbor's door, yelling for help and saying, "[D]on't let him in, don't let him in." The neighbor, Ngoc Thach, let A.C. in and called 911. A.C. told Thach that Kone "picked her up, and they were playing around, or having fun at his house, and he started . . . hurting her, and that's when she was scared and ran." Another neighbor, Kathleen France, also called 911 after hearing a woman screaming, "[H]elp, help, help, rape, rape, rape," and an angry male voice yelling.

¶5 Officer Kevin Bateman arrived a couple of minutes after the 911 call, at approximately 2:45 a.m. Officer

---

[1] A.C. could not remember if Kone penetrated her with his penis, but she remembered seeing a condom wrapper.

Bateman said A.C. was "crying so hysterically" that he "couldn't make out anything she was saying." Eventually, A.C. said that "Mo[hammed] had beat her with what she described as a paddle and prevented her from trying to escape." A.C. told Officer Bateman, "I was like a prisoner in his dungeon."

¶6 Officer Bateman saw the open window to the bathroom and a window screen lying on the ground at Kone's house. Kone did not respond to the officers loudly knocking on his door. However, Kone's brother responded and agreed to get a key and let them in. When the police tried to open the door to Kone's apartment, the deadbolt was in place and the police left.

¶7 Officer Bateman took photographs of A.C.'s injuries and she agreed to give a taped-recorded statement at the police station. The taped interview lasted for approximately 30 minutes and ended because A.C. was too upset to continue. During the interview, A.C. told Officer Bateman that while at the park, Kone made her touch his penis, hit her on the buttocks, removed her pants, digitally raped her, and then forced her to go to his house.

¶8 Later, A.C. told medical treatment providers at the emergency room that she was vaginally and anally raped, and beaten with a paddle. A.C. had heavy bruising on her buttocks, lower back, and thighs that later turned purple and black. Forensic testing established the presence of sperm.

¶9 Later that day, Detective Kathy Holt met with A.C. A.C. agreed to drive with Detective Holt to West Fenwick Park. When they arrived at the park, Kone was standing in the parking lot. A.C. told Detective Holt, "That's him," and "almost jump[ed] out of her seat and cower[ed] down in the car." Detective Holt called for backup before contacting Kone.

¶10 After reading Kone his *Miranda*[2] rights, Kone agreed to talk with Detective Holt. Kone told Detective Holt that he met A.C. at the bus stop. He said that A.C. had some beer and told him she was having a bad day. He said that after talking to her, "they decided to drink some beer together" at his house. Kone said they took the bus to his house but went to the park because his brother was home. He said that they had sex at the park. Kone said that while at the park, "she started becoming sexual towards him, and that she wanted to have sex with him." Kone told Detective Holt that A.C. wanted to have vaginal and anal sex.

> And I asked, what type of sex basically they were talking about? And I said, Did you have vaginal sex?
>
> And he said, Yes.
>
> And I asked if they had anal sex?
>
> And he said, Yes.
>
> He told me that she asked him to do this, and so they stayed in the park for a while.

Q  By asking him to do this, was he referring to the vaginal sex, anal sex, or both in general?

A  I took that to mean both.

Q  Did he indicate whether or not they were drinking at the apartment?

A  Yes.

Q  How much did he say and what did he say they were drinking?

A  He said he had had two beers, and they drank the Cisco, and he said that she had had more because she told him she had been drinking all day.

Q  Where did they go after the park, according to the Defendant?

A  After that, then they did walk back to his house.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶11 Kone denied "putting his fingers in [A.C.'s] vaginal area" but admitted putting his fingers "in her rectal area" because "he said she asked him to feel her rectal area."

¶12 Kone told Detective Holt that when they were at his house, A.C. left by going out the bathroom window but he did not know why. Kone said that after A.C. left, he went to bed.

¶13 When Detective Holt asked Kone about whether he used a paddle, he said that A.C. asked him if he had a paddle because she wanted him to hurt her.

> And he said, Okay. He said that at the park she had asked him to hurt her and asked him if he had a paddle. He said he might have one at home.
>
> And I asked him why he didn't tell me that previously?
>
> And he said that in his opinion that wasn't considered the sex with her that he had been talking about.

Q   Did he describe the paddle that he found?

Did you in fact find a paddle?

A   Yes, I did.
Q   Well, I am asking, did he find a paddle?
A   Yes.
Q   Or did he?
A   He did.
Q   Did he confirm that he did in fact use a paddle with her?
A   Yes.
Q   And did he describe the paddle that he used on her?
A   Yes.

¶14 Two days later, Detective Holt and a prosecutor conducted a joint interview with A.C. During the interview, A.C. said that contrary to her statements to Officer Bateman, she willingly went with Kone to his house and the sexual contact she described took place at Kone's house, and not at the park. The State did not file charges against Kone until after filing charges of attempted rape of A.B. in 2009.

*Attempted Rape of A.B.*

¶15 A.B. has been homeless off and on since 1978. A.B. stays primarily in San Francisco, California, but was in Washington from January to April 2009.

¶16 In the early morning of February 21, 2009, A.B. was drinking with some of friends in an alley in Federal Way. At some point, Kone joined the group, and A.B. offered him some beer. Kone invited A.B. to his house to "smoke some pot and like stay the night, take a shower." Kone's friend agreed to drive them to Kone's house. On the way, A.B. asked the driver for a cigarette. The friend dropped off Kone and A.B. in the parking lot of West Fenwick Park.

¶17 Kone was angry because A.B. tried to take his friend's pack of cigarettes, and called her a "bitch." Kone and A.B. stopped at a table in the park. Kone was still angry and he continued to call A.B. a "bitch." A.B. told Kone, "I can't deal with this. Have a good night. It was nice to meet you . . . . Thanks anyways, but no thanks." As A.B. started walking away, A.B. said that Kone grabbed her and "started hitting me in my butt with his . . . open hand" and "calling me a bitch." Kone told A.B. to bend over because he wanted to have sex with her, saying, "[F]uck you, bitch and bend over, . . . I want to have sex with you." Kone then grabbed A.B.'s breasts and tried to pull her pants down. A.B. broke away and tried to run to the parking lot but was unable to run very far because of an injured leg.

¶18 A.B. said that she decided to "act crazy" so Kone would not rape her, and began pulling her hair out and hitting herself. A.B. then tried to roll down a hill away from him. But before she rolled down the hill, Kone "started kicking me," hitting her in the mouth. After A.B. reached the bottom of the hill, she gave Kone some crumpled dollar bills and begged him to leave her alone. A.B. then started yelling and tried to flag down cars in the road.

¶19 Christina Barton lives across the street from West Fenwick Park. Barton was awakened by a woman scream-

ing in the park. Barton said that after she heard a woman screaming, "[H]elp, help, help, and just sort of that gut wrenching horror, I need help, something that made my stomach drop," she called 911. Barton watched as the police arrived. Barton said that the woman told the police, "I have been raped, help me," and saw her point to a man walking away, saying, "Stop him, stop him. She kept saying, That's him."

¶20 Officer Thomas Clark said that when he and Officer Joe Johnson were close to the intersection near the park, he "saw a female standing in the roadway yelling . . . . Her hair was all over the place. She had blood around her mouth, and she was hysterical, screaming." Officer Johnson stayed with A.B. while Officer Clark headed down the street toward Kone. Officer Johnson tried to get A.B. to calm down. Officer Johnson said that "with her injuries that she had," it appeared A.B. was suffering "at least an early onset of a form of shock." Officer Johnson said A.B. was extremely upset and described her injuries as follows:

A   . . . She had fresh blood around her mouth and cuts under her right eyes [sic]. Her clothes were dirty and disheveled, and she was in a very erratic state, or upset state.

Q   How could you tell she was in an erratic or upset state?

A   Well, one, her condition, her facial area. She was definitely nursing a wound, holding her head, crying, repeating herself over and over again. It was very hard to get her to focus as in look me in the eye and focus so I could get what I needed out of her of what happened to her. It took a while just to calm her down.

When she calmed down, A.B. told Officer Johnson that Kone came out of the woods, punched her in the face, and stole her money.

¶21 Officer Clark yelled at Kone to stop and chased after him. After catching up with Kone, Officer Clark noticed that he had grass stains and blood stains on his pants from the knees down. When Officer Clark asked about the stains,

Kone said "that he had gotten those playing soccer in Federal Way earlier." Kone told Officer Clark that he did not know A.B. and did not assault her. After talking to Kone, Officer Clark found A.B.'s backpack in the park north of the main parking lot and a large clump of A.B.'s hair nearby.

¶22 The police took photos of A.B.'s injuries. At the emergency room, the doctor noted contusions on A.B.'s face, abrasions on her right buttock, a laceration on her face, and "hair ripped out." A.B. told the emergency room doctor that she was assaulted by a man who hit and kicked her while walking through the park.

¶23 Detective Tim Ford was assigned the case on February 23 and attempted to contact A.B. Detective Ford was not able to locate A.B. until February 27. Detective Ford interviewed A.B. In the interview, A.B. did not say that Kone "came running out of the woods and that was the first time she met him." A.B. told Detective Ford that she met Kone in Federal Way at a convenience store.

*Procedural History*

¶24 On February 25, 2009, the State charged Kone with robbery in the second degree of A.B., cause number 09-1--02489-4. Kone was arraigned on March 10, and a case scheduling hearing was scheduled for March 24. On March 20, the State notified the defense that it planned to amend the information to charge Kone with attempted rape. At the case scheduling hearing, the court set a trial date of May 7 with a time-to-trial expiration date of May 9, and scheduled the omnibus hearing for April 24.

¶25 On March 31, the State filed charges against Kone for rape in the second degree of A.C., cause number 09-1--02912-8. Kone was arraigned on April 13, an omnibus hearing was set for May 29, and the trial was scheduled to begin on June 10.

¶26 At the April 24 omnibus hearing on the charges in the A.B. case, the State moved to amend the information to

charge Kone with attempted rape in the second degree instead of robbery in the second degree. Kone did not object. The State also filed a motion for joinder of the A.B. case and the A.C. case for trial, and argued that the evidence was cross admissible under chapter 10.58 RCW and ER 404(b). The court scheduled a hearing for May 1 on the State's motion for joinder of the cases for trial. Following the April 24 omnibus hearing, Detective Ford and the prosecutor attempted to locate A.B. to schedule a defense interview and obtain a DNA[3] sample.

¶27 At the May 1 hearing on the motion for joinder, the State moved to dismiss the charges against Kone for the attempted rape of A.B. without prejudice. The prosecutor told the court that the efforts to contact A.B. were unsuccessful but the State planned to refile the charges after locating her. Kone objected and argued the court should dismiss the case with prejudice based on governmental mismanagement. Kone claimed that the State's failure to locate A.B. impacted his time-to-trial rights and prevented him from receiving effective assistance of counsel. The trial court granted the State's motion to dismiss the case without prejudice but ruled that "the defense has the right to file a motion to dismiss with prejudice should there be a refiling."

¶28 After locating A.B., the State refiled charges against Kone on May 28, cause number 09-1-03352-4. The information alleged attempted rape in the second degree of A.B. and, in the alternative, indecent liberties. The trial court granted the State's motion for joinder of the A.B. and A.C. cases for trial. The defense filed a motion to dismiss both cases with prejudice under CrR 8.3(b). The defense argued that the State failed to make reasonable efforts to locate A.B. and failed to respond to discovery requests in the A.C. case. The trial court denied the CrR 8.3(b) motion to dismiss.

¶29 Over the course of an eight-day trial, a number of witnesses testified, including police officers, the emergency

---

[3] (Deoxyribonucleic acid.)

room doctors, Detective Holt, Detective Ford, a forensic expert, A.C., and A.B. The defense theory at trial was that neither A.C. nor A.B. were credible and sex with A.C. was consensual.

¶30 A.C. testified that what she told Officer Bateman about what happened was true but "[t]he location was wrong." A.C. said she exaggerated what happened because she was mad at Kone and vindictive.

Q   Do you recall telling Officer Bateman that he tried to pull down your pants at the park?

A   If I said it, I probably exaggerated it because he really — I wouldn't have gone to his house had he done something like that.

Q   Why would you have exaggerated it?

A   The night that it happened.

Q   You were pretty mad at the defendant that night; is that fair to say?

A   Yes, vindictive, we call it.

Q   Why were you vindictive?

A   I was very mad at him. He just, what he had done and —

Q   And I don't mean to be jesting by this question. I want to make it very plain for the jury.

    Were you mad at him for anything other than putting his finger into you against your will, assaulting you as he did?

A   No. The paddling and the pushing me back, not letting me get out.

Q   Did he try to put his finger inside you at the park?

A   No.

Q   You actually wound up indicating that he put his fingers inside of you at the park to Officer Bateman; is that correct?

A   Yes.

Q   Is that correct?

A   No, it's not. I believe I was confused at the time also because anything that happened happened at the house. It

didn't happen at the park. It was a little, you know, like I said, just goofing around stuff.

¶31 A.B. admitted that she lied to the police when she said that she was "just walking in the park" and the defendant came out of the woods, assaulted her, and took her money. A.B. said she did not tell the truth about what happened because she thought the police would think she was a "drug addict" and would not believe her. The forensic evidence established the blood on Kone's pants was from A.B.

¶32 The jury convicted Kone of rape in the second degree of A.C. and attempted rape in the second degree and indecent liberties of A.B. Kone appeals.

## ANALYSIS

### CrR 8.3(b) Motion To Dismiss

¶33 Kone argues the trial court erred in denying his CrR 8.3(b) motion to dismiss the charges against him in the A.B. case. Kone asserts the State's failure to locate A.B. before the originally scheduled trial date of May 7 constituted governmental mismanagement and prejudiced his right to a speedy trial under CrR 3.3.

¶34 CrR 8.3(b) states:

The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial. The court shall set forth its reasons in a written order.

The dismissal of charges under CrR 8.3(b) is an " 'extraordinary remedy.' " *State v. Rohrich*, 149 Wn.2d 647, 658, 71 P.3d 638 (2003) (quoting *State v. Baker*, 78 Wn.2d 327, 332, 474 P.2d 254 (1970)). A trial court may dismiss charges under CrR 8.3(b) if the defendant shows by a preponderance of the evidence (1) arbitrary action or governmental

misconduct and (2) prejudice affecting the defendant's right to a fair trial. *Rohrich*, 149 Wn.2d at 654. Governmental misconduct need not be evil or dishonest. Simple mismanagement is sufficient. *State v. Blackwell*, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993). However, the defendant must show actual prejudice, not merely speculative prejudice, affected his right to a fair trial. *Rohrich*, 149 Wn.2d at 657.

■ ¶35 We review the trial court's decision to deny a motion to dismiss under CrR 8.3 for abuse of discretion, that is, whether the decision was manifestly unreasonable, based on untenable grounds, or made for untenable reasons. *State v. Michielli*, 132 Wn.2d 229, 240, 937 P.2d 587 (1997); *Blackwell*, 120 Wn.2d at 830.

■ ¶36 Below, Kone argued that because the State did not make reasonable efforts to locate A.B. before the originally scheduled May 7 trial date, the court should grant his CrR 8.3(b) motion to dismiss the charges. The trial court rejected Kone's argument. The ruling states, in pertinent part:

> Ultimately, she didn't tell them where she was. And with respect to the California address, there's no evidence that that is, in fact, where she was, at least not from what the Court can glean from the record. A.B. is a homeless person, and the Court concludes that it may have been possible for the State to contact her sooner, but there's really no concrete evidence that this is the case; and therefore, the Court concludes that under 8.3(b) there was no misconduct.

¶37 The record supports the trial court's decision.[4] When A.B. contacted Detective Ford on March 19, she told him that she planned to move to Tacoma on April 1, and told the detective she would provide him with the new phone number after she moved. After the omnibus hearing on

---

[4] CrR 8.3(a) states:

**On Motion of Prosecution.** The court may, in its discretion, upon written motion of the prosecuting attorney setting forth the reasons therefor, dismiss an indictment, information or complaint.

April 24, the prosecutor contacted Detective Ford to arrange a defense interview with A.B. Detective Ford attempted to contact A.B. using the contact information she had given him. The State paid for additional minutes on her cell phone. But calls to that phone were not answered. Detective Ford contacted A.B.'s family members, asking them to tell A.B. to immediately call. Because Detective Ford was not able to locate A.B., the trial court granted the State's motion to dismiss the case without prejudice and strike the May 7 trial date.

¶38 On May 5, A.B.'s brother in Oregon told Detective Ford that A.B. hitchhiked to San Francisco. The Detective continued to leave messages on A.B.'s cell phone, but she did not respond. The Detective also left messages with A.B.'s family members in California.

¶39 A.B. contacted Detective Ford on May 7. A.B. was in San Francisco. A.B. told Detective Ford that she lost her cell phone and her identification. The State helped A.B. arrange to return to Seattle. A.B. arrived in Seattle on May 27. On May 28, the State refiled the charge of attempted rape in the second degree and indecent liberties. The trial court did not abuse its discretion in deciding that the State's efforts to contact A.B. were reasonable under the circumstances and did not amount to governmental mismanagement. *See State v. Wilson*, 149 Wn.2d 1, 65 P.3d 657 (2003).

¶40 In an attempt to establish prejudice under CrR 8.3(b), for the first time on appeal, Kone asserts the trial court's "unjustified dismissal without prejudice violated [his] right to a speedy trial" under CrR 8.3(b). We do not consider an argument raised for the first time on appeal unless it is a manifest error affecting a constitutional right. RAP 2.5(a); *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995).

¶41 Here, Kone did not argue below that the court should grant his motion to dismiss under CrR 8.3(b) for

violating CrR 3.3, the time-to-trial rule, nor could he.[5] The trial court granted the State's motion to dismiss without prejudice on May 1; the trial date was scheduled for May 7 with an expiration date of May 9. Under CrR 3.3(e)(4), "[t]he time between the dismissal of a charge and the refiling of the same or related charge" is excluded in computing the time for trial. In addition, under CrR 3.3(b)(5), "[i]f any period of time is excluded pursuant to section (e), the allowable time for trial shall not expire earlier than 30 days after the end of that excluded period."

¶42 Equally problematic is Kone's effort to raise a violation of CrR 3.3 as a basis for dismissal in a motion to dismiss under CrR 8.3(b). CrR 3.3 states, in pertinent part, "No case shall be dismissed for time-to-trial reasons except as expressly required by this rule, a statute, or the state or federal constitution." CrR 3.3(h). We interpret court rules as we do statutes drafted by the legislature. *State v. George*, 160 Wn.2d 727, 735, 158 P.3d 1169 (2007). We look to the plain language of the rule and construe the rule in accord with the drafting body's intent. *Gourley v. Gourley*, 158 Wn.2d 460, 466, 145 P.3d 1185 (2006). If the rule's meaning is unambiguous, we need look no further. *Spokane County v. Specialty Auto & Truck Painting, Inc.*, 153 Wn.2d 238, 249, 103 P.3d 792 (2004) (Sanders, J., concurring in part, dissenting in part).

¶43 In 2003, the Washington Supreme Court amended the time-for-trial rule based on the recommendations of the Time-for-Trial Task Force. *George*, 160 Wn.2d at 737. One of the stated goals of the amendments was to "[r]educe the

---

[5] As the State noted below in response to Kone's motion to dismiss under CrR 8.3(b), "The Defendant notes that a speedy trial violation may form the basis for prejudice under [*State*] *v. Michielli* but does not argue that a speedy trial violation occurred in this case."

likelihood that criminal cases will need to be dismissed with prejudice."[6]

¶44 In its *Final Report*, the Task Force also specifically addresses judicial interpretation of the time-for-trial rule, and the intent to amend the rule to eliminate ambiguity.

> Task Force members are concerned over the degree to which the time-for-trial standards have become less governed by the express language of the rule and more governed by judicial opinions. To address this concern, the task force has tried to fashion a rule that is simpler, has fewer ambiguities, and covers more of the field of time-for-trial issues, with the hope that a reader of the rule will have a better understanding of the overall picture than currently exists. The Task Force also recommends adopting a provision in CrR 3.3 expressly stating that the rule is intended to cover all the reasons why a case should be dismissed under the rule. Courts should not read into the rule any other reasons beyond those that are expressly stated in the rule. Any other reasons should be analyzed under the corresponding constitutional provisions (Wash. Const. Art. I, § 22, and U.S. Const., Amend. 6).[7]

¶45 The plain and unambiguous language of CrR 3.3 prohibits dismissal of a case under CrR 8.3(b) for violation of a defendant's time-to-trial rights under CrR 3.3 unless a defendant can show a violation of CrR 3.3, a statute, or the state or federal constitution. Here, Kone does not assert a violation of a statute or that his constitutional rights were violated. *State v. Thomas*, 146 Wn. App. 568, 575, 191 P.3d 913 (2008) (dismissal is not a permissible remedy unless the defendant's constitutional right to a trial under CrR 3.3 is violated).

¶46 We hold that because CrR 3.3(h) specifically prohibits dismissal for time-to-trial reasons unless expressly re-

---

[6] Time-for-Trial Task Force, *Time-for-Trial Final Report*, WASH. COURTS, http://www.courts.wa.gov/programs_orgs/pos_tft/?fa=pos_tft.reportHome (last visited Dec. 12, 2011).

[7] TIME-FOR-TRIAL TASK FORCE, WASHINGTON COURTS, FINAL REPORT § I(B)(1), at 6 (Oct. 2002) (on file with Admin. Office of Courts), *available at* http://www.courts.wa.gov/programs_orgs/pos_tft/?fa=pos_tft.reportHome.

quired by the rule, a statute, or constitution, the plain and unambiguous language of CrR 3.3(h) precludes Kone from arguing that the trial court erred in denying his motion to dismiss under CrR 8.3(b). CrR 3.3(b) provides the exclusive means to challenge a violation of the time-to-trial rule.[8]

¶47 Because the remainder of this opinion has no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

Dwyer, C.J., and Cox, J., concur.

Review denied at 173 Wn.2d 1034 (2012).

---

[8] In his statement of additional authorities, Kone cites *State v. Chhom*, 162 Wn.2d 451, 173 P.3d 234 (2007). *Chhom* is distinguishable. The court in *Chhom* avoided a literal interpretation of the words "detained . . . outside the county" in order to prevent absurd results. *Chhom*, 162 Wn.2d at 458.