IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>   v.<br><br>JOSEPH ISAIAH LEONARD,<br><br>     Appellant. | No. 86179-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — Joseph Isaiah Leonard appeals his conviction for attempting to rob a cherry stand with a firearm and assaulting witnesses to the crime. He argues the State violated his constitutional right to confront two key witnesses, when it admittedly "improperly" discussed the content of those witnesses' testimony prior to trial. Leonard additionally argues that the trial court erred by failing to dismiss the charges against him after the State mishandled discovery, and by allowing the State to make an improper statement in its closing argument. We disagree, affirm the conviction, but remand to strike his Victim Penalty Assessment (VPA).

## I.  BACKGROUND

The parties do not dispute that the following facts occurred, as Leonard claims that this matter is a case of mistaken identity. On June 27, 2020, a man with a face covering and dark bandana approached a cherry stand in Buckley, and

ordered the attendants to give him their money. Both of the attendants, Suzi Goodwin and Laura Meade, saw the assailant with his hands on a firearm. Goodwin put her hands up and stepped away. Meade said, "[h]ell no." The man tugged Meade's fanny pack, which they then tussled over. Goodwin screamed. The man ran away.

Aaron and Jillian Horner were a married couple who lived near the fruit stand. When they heard screaming, Mr. and Ms. Horner and their young son ran towards the noise. Mr. Horner saw a man run near their house and toward a parked car. The man pointed a gun at the Horners from approximately 50 feet away, with Mr. Horner standing in front of Ms. Horner and their son. Mr. Horner saw the gunman get into the passenger side of a "light-teal-green Dodge Stratus." The Horners' other contemporaneous observations will be described in more detail below.

The Stratus traveled at speeds exceeding 100 miles per hour as a police vehicle pursued it for approximately four to five miles. The Stratus collided with another car and then rolled off the road. Law enforcement arrested a man who exited the passenger side, with dark hair, wearing a grey sweatshirt, and identified him as Leonard. At the scene, law enforcement found a firearm. Law enforcement also found a bandana nearby that was "a black and white piece of cloth with white filigree and teal, orange, red, black, and white markings in the middle."

The State charged Leonard with two counts of attempted robbery in the first degree, two counts of assault in the second degree, and one count of unlawful possession of a firearm. As we will discuss in more detail later, before his trial

began, Leonard brought multiple motions related to the State's alleged prosecutorial misconduct, both for its contact with the Horners and for providing incomplete or dilatory discovery. The trial court denied Leonard's various motions and ordered alternate remedies which will be discussed below.

At trial, the jury found Leonard guilty on all counts. Leonard appeals.

## II.    ANALYSIS

### A.    Leonard's Sixth Amendment Right to Cross-Examine the State's Witnesses

#### 1. Additional Factual and Procedural Background

On the same date of the robbery, the Horners each gave handwritten statements describing their assailant. Ms. Horner described "a hispanic [sic] male wearing a *white* sweatshirt, dark blue jeans and a black bandana as a face mask." (Emphasis added). Meanwhile, Mr. Horner described a man with a "dark complexion, wearing a black bandana with white flowers on it. He had dark jeans and a *white* hoodie." (Emphasis added).

Approximately six months later, between December 14 and 15, 2020, State's counsel had the following email exchange with Ms. Horner:

> State: I hope you remember me; we spoke few weeks ago about that robbery you and your husband witnessed. I found the handwritten statements you and your husband drafted, and am hoping you can refresh your memory. Also I've attached the 911 call you made. Can you review for accuracy? And do these items (sweatshirt and bandana) look familiar?[1] *Can you please ask your husband?* Thank you!

> Ms. Horner: The bandana definitely looks correct. That doesn't *look like* the sweatshirt the guy who actually robbed the place was wearing though, unless he was wearing it underneath. That *possibly*

---

[1] The email attached an audio file of the 911 call and photos of the items in question.

3

could've been the drivers [sic], he never left the vehicle so we never got a good look at him.

State: Thank you, [Ms. Horner]. *This was the sweatshirt that the medics cut off of him* and nothing else was found inside the car. The driver was wearing a blue/black shirt.

Ms. Horner: *I thought the hoodie was white, but it could've been grey.* Or they ditched it when they were running before police were actually chasing them. The bandana is for sure it though.

State: In the light, *it could very well have appeared white.* And *others described a grey hoodie.* So *we're good.* Thank you!

(Emphasis added).

Ms. Horner then responded: "true, everything happened so fast and truthfully all I could focus on was the gun lol." The two continued to correspond about where the assailant parked his car, etc.

In March 2021, law enforcement interviewed the Horners, separately. Mr. Horner described a "black mask" with a "white pattern on it . . . looked like the bandanas . . . it had a native pattern on it." He described a "grey hoodie" with a "Seahawk symbol on the front of it, the Native American style." Ms. Horner stated "he had a black bandana with like white . . . flowers from a distance . . . jeans and a long hoodie and a mask, like you know, a bandana . . ." She did not describe the color of his sweatshirt.

In November 2021, Leonard moved to dismiss the charges against him (except for the charge of unlawful possession of a firearm) under CrR 8.3(b) based on the State's conversation with Ms. Horner.[2] Specifically, Leonard asserted that

---

[2] Prior to that motion, Leonard had moved to disqualify the prosecutor for emailing Ms. Horner because "the intent was to sway the testimony . . . of the suspect wearing a white hoodie . . . to a gray hoodie." And, in so doing, Leonard claims

4

the State "tamper[ed]" with the Horners' testimony, arguing "we have a witness who originally described a white sweatshirt, effectively being coached to change testimony to that of a gray sweatshirt – here, one with a Seahawks logo." At no time did Leonard argue his constitutional rights were violated.

At the hearing, the State conceded its communications with Ms. Horner were "improper." The State further conceded that Mr. Horner was likely privy to the email correspondence between it and Ms. Horner, thus potentially tainting his testimony too. However, the State argued the court should consider available intermediate remedies short of dismissing the charges. The State offered not to elicit in-court identification of the sweatshirt or bandana from the Horners. Instead, it would introduce only the original (inaccurate) statements the Horners made to law enforcement on the day of the incident, and not offer the (accurate) statement in Mr. Horner's subsequently recorded interview.

The court denied Leonard's motion to dismiss. The court noted that "the difficulty with this motion is the encouragement to draw a different conclusion than what was concluded at the scene. It's not improper to refresh. It is improper to encourage." The court concluded "there needs to be some sort of remedy fashioned . . . the remedy that's been proposed is one that I'm going to order,

she "made herself a material witness and is thus no longer qualified to act as an advocate" per RPC 3.7(a). The trial court, though expressing concern about the State's conduct, denied Leonard's motion to disqualify because "I don't think it rises to the level under the analysis that the Court has to have . . . to require that [the State] be removed from the case. I do believe that the *remedy* is that *the text messages themselves*, in whatever format is determined at trial *would be admissible*, and it would be on the four corners of those text messages." (Emphasis added).

5

which is, essentially, *the State is stuck with the description that the Horners provided at the scene to the officers*." (Emphasis added). The court further ordered that, if Leonard wanted to impeach either of the Horners, he could introduce the email correspondence between them and the State.

2. Law

"The right to confront and cross-examine adverse witnesses is guaranteed by both the federal and state constitutions." State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002) (quoting U.S. CONST. amend 6; CONST. art. I, § 22). "The primary and most important component is the right to conduct a meaningful cross-examination of adverse witnesses." Id. "The purpose is to test the perception, memory, and credibility of witnesses." Id. "Whenever the right to confront is denied, the ultimate integrity of this fact-finding process is called into question . . . [a]s such, the right to confront must be zealously guarded." Id. "However, the right to cross-examine adverse witnesses is not absolute." Id.

Namely, although in a different context,[3] our Supreme Court has held that "[t]he Sixth Amendment to the United States Constitution guarantees a defendant a fair trial but not a trial free from error." State v. Fisher, 165 Wn.2d 727, 746-47, 202 P.3d 937 (2009). "The burden rests on the defendant to show the prosecuting attorney's conduct was both improper and prejudicial." Id. at 747; see also Br. of Appellant at 31 (citing State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003)). "Once proved, prosecutorial misconduct is grounds for reversal where there is a

---

[3] Leonard's opening brief provides a cursory and undeveloped presentation of his somewhat novel confrontation-clause-via-misconduct argument, but he offers the same foregoing and following legal principles.

substantial likelihood the improper conduct affected the jury." Fisher, 165 Wn.2d at 747; see also Br. of Appellant at 31-32 (citing State v. Lucas-Vicente, 22 Wn. App. 2d 212, 223–24, 510 P.3d 1006 (2022)). We review an alleged denial of such constitutional rights de novo. State v. Lizarraga, 191 Wn. App. 530, 551, 364 P.3d 810 (2015).

3. Discussion

On appeal, Leonard asserts that the State's conceded interference with the Horner's testimony violated his Sixth Amendment right to confront those witnesses.[4] We discuss each witness in turn.

a. Ms. Horner

As to Ms. Horner, Leonard argues that the State's interference prevented her from testifying at all, thus implicating his Sixth Amendment right. Leonard avers "Ms. Horner felt anxious because [the State] had compromised her testimony on the record and she would open herself to potential perjury charges on the stand." Indeed, Ms. Horner did not testify, but this claim fails for several reasons.

First, Leonard does not cite to anything in the record to support the claim that Ms. Horner "felt anxious" because of the State's interference. The court is not

---

[4] In his reply brief, Leonard argues both that the trial court's denial of his CrR 8.3(b) motion was error and, "[a]dditionally, separate from CrR 8.3," that the State's misconduct "prejudiced his [constitutional] right to a fair trial." He did not, however, in his opening brief assign error to the court's denial of his CrR 8.3(b) motion or substantively argue that the basis of his constitutional claim was a generalized right to a fair trial, arguing only that the misconduct meant "he could not meaningfully cross-examine or impeach either witness." To the extent they are stand-alone claims of error, we decline to consider them because he raises both issues for the first time on reply. State v. Pervez, 15 Wn. App. 2d 265, 272, n. 11, 478 P.3d 103 (2020).

required to search the record to locate the portions relevant to a litigant's arguments. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 819, 828 P.2d 549 (1992). The record, on the contrary, indicates that neither party was able to locate Ms. Horner before trial. And the State reported that Mr. Horner advised that Ms. Horner feared retaliation from Leonard. When Mr. Horner testified, he also explained that Ms. Horner was not present because she suffers from "crippling anxiety and depression" without any suggestion that the State's interference caused or exacerbated those conditions. In other words, the record does not bear out the factual causal predicate underlying the claim.

Establishing this factual predicate is important because, second, Ms. Horner's absence alone does not mean there was a constitutional violation of Leonard's right to cross-examine her because "[m]ore than the mere absence of testimony is necessary to establish a violation of the right [to cross-examine a State's witness]." Lizarraga, 191 Wn. App. at 552 (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982)).

Third, although Leonard had the right, though not absolute, to compel Ms. Horner to testify, he did not exercise it. Id. Neither party at trial requested a material witness warrant. Instead, Leonard argued he *would* request a mistrial if trial continued without Ms. Horner's appearance, because the existing motions in limine and opening statement were predicated on being able to cross-examine her. However, at trial, Leonard did not move for a mistrial nor did he raise a Sixth Amendment challenge of any kind to Ms. Horner's absence at any time (which we will address further below). Therefore, he cannot raise the issue now because,

e.g., "[t]he availability of the Sixth Amendment compulsory process clause 'is dependent entirely on the defendant's initiative.'" Lizarraga, 191 Wn. App. at 552 (quoting Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)).

Fourth, Leonard must show that the State's misconduct would have prevented him from "meaningfully cross-examining" Ms. Horner about her description of their assailant, had she testified. Darden, 145 Wn.2d at 620. A close reading of the email correspondence, however, shows that Ms. Horner remained consistent about her description of a white sweatshirt instead of a grey one, besides acknowledging once that "maybe" it could be a different color. The record does not indicate that the State's, concededly, improper suggestion Leonard wore a grey sweatshirt would have changed her testimony at trial, if she had been present. Moreover, nothing the record suggests that any effect on her testimony would have prevented Leonard from meaningfully cross-examining her, let alone establishes that the misconduct would have affected the final verdict against Leonard. Fisher, 165 Wn.2d at 747.

In short, we conclude Leonard has not met his burden to show the State's misconduct caused Ms. Horner's absence, prevented Leonard from meaningfully cross-examining this witness, had he taken the initiative to compel her to testify, or otherwise affected the verdict by such mere absence.

b. Mr. Horner

Again, the State conceded below and concedes again on appeal that Mr. Horner—while not a participant of the email exchange—became privy to the

correspondence between the State and Ms. Horner, thus potentially interfering with his testimony as well. We accept the State's concession and assume the couple discussed the State's improper suggestion about the color of the sweatshirt, and discussed the State's improper suggestion that two of its witness, at best, compared or, at worst, coordinated their testimony. From there, Leonard argues that this "tampering" violated his right to meaningfully cross-examine Mr. Horner's testimony. This claim fails for three overarching reasons, which require additional factual background.

At trial, when the State examined Mr. Horner, it asked him: "Do you recall what description you gave as far as his physical size and the like?" Mr. Horner gave the following answer, which Leonard's counsel interrupted: "He was wearing a light –". The court held a colloquy outside the presence of the jury, during which the State (a) represented she was "not going to go anywhere near the hoodie," (b) asserted that the "jury has already heard the description he gave to the police,"[5] and (c) would only ask Mr. Horner if he gave a description to the police in a "yes-or-no fashion."

Upon the jury's return, the court instructed the jury to disregard the partial answer. And the State further questioned Mr. Horner, as follows:

Q. (By the State) Mr. Horner, did a police officer make contact with you to interview you about what happened?
A. He did, yes.

Q. And do you recall giving a description, at that time, to the police

---

[5] The officer (Fetterman) who took Mr. Horner's statement testified that Mr. Horner described the clothing the gunman was wearing to Officer Fetterman as including "[a] light -- or light-gray sweatshirt." This testimony was not consistent with the handwritten statement, which described the sweatshirt as white.

about the person that pointed the gun at you and your wife?
A. Yes, I did.

Q. Did you give a description of the type of clothing he was wearing?
A. I did, yes.

Based on these facts, Leonard now avers that "Mr. Horner could not be cross-examined about [1] his prior inconsistent statements and [2] his insinuation that his 'identification' matched Mr. Leonard."

This argument fails, first, because both claims are simply factually inaccurate. As to the former claim, the State's examination was limited to the questions reviewed above, but the court expressly permitted Leonard to impeach either of the Horners with the email correspondence between Ms. Horner and the State to remedy Leonard's CrR 8.3 motion. In other words, Leonard could have elicited from Horner that his written statement described the sweatshirt as white. Leonard simply chose not to.

As to the latter claim, Horner himself did not insinuate at trial that he described the hoodie (correctly) as grey on the date of the crime, thus "matching" that found on Leonard. In pertinent part, he testified that he provided "*a* description" to the police without going into any detail.

To the extent the "insinuation" comes from Officer Fetterman's inaccurate testimony (that Mr. Horner described "a light – or light-gray sweatshirt"), Leonard could have cross examined Officer Fetter with Mr. Horner's written statement that described the sweatshirt as "white." Leonard did not impeach Officer Fetterman in

11

that way, despite having the opportunity to do so.[6]

On the contrary—and as the second reason this argument fails—Leonard's counsel on cross-examination asked Mr. Horner:

- if his memory was "fresh" when he gave the handwritten sworn statement to law enforcement, to which Mr. Horner agreed;

- if he knew that details in the statement "matter[ed]" because law enforcement would rely on his statements therein, to which Mr. Horner agreed; and sought to confirm that

- "any detail that [he] might have remembered would have made it into that statement," to which Mr. Horner agreed.

And, in closing argument, Leonard's counsel argued that the evidence showed it was a "a white male in a white hoodie", referencing inter alia Officer Fetterman's testimony "that Mr. Horner had told him that the suspect was wearing a white or gray hoodie" and Ms. Horner's 911 call where she indicated the assailant was wearing "a white hoodie".

In other words, despite the inconsistency of Officer Fetterman's testimony, Leonard's cross-examination was focused only on driving home the reliability of Mr. Horner's statement. Regardless of why Leonard chose not to cross-examine Mr. Horner about the inconsistency between his written statement and his alleged verbal statements to the police or the prosecutor, Leonard had the opportunity to meaningfully cross-examine Mr. Horner on all relevant details of his testimony in such as way as to test his "perception, memory, and credibility." Darden, 145 Wn.2d at 620 (quoting State v. Parris, 98 Wn.2d 140, 144, 654 P.2d 77 (1982)

---

[6] Leonard also did not assign error to Officer Fetterman testifying about the out-of-court statements Mr. Horner made as inadmissible hearsay. Therefore, we decline to consider it.

(quoting U.S. CONST. amend 6; CONST. art. I, § 22)). Leonard chose a different route.

Third—and this reason applies equally to any challenge to the absence of Ms. Horner's testimony—"a defendant [must] raise an objection at trial or waive the right of confrontation. Requiring an objection brings this claim to align with what we employ in other cases where we have held that some constitutional rights may be waived by a failure to object." State v. Burns, 193 Wn.2d 190, 210-11, 438 P.3d 1183 (2019). Here, neither in the colloquy with the court reviewed above nor at any other time did Leonard object *on Sixth Amendment grounds* to the court's remedial measure that Mr. Horner may only testify to the fact that he gave the police a description at the scene. Leonard also did not object to the court's remedial measure that permitted Leonard to impeach his testimony with those emails. Instead, per the record reviewed above, Leonard chose to take advantage of the evidentiary limitation placed upon the State in cross-examination. Far from objecting, Leonard's counsel hammered home the discrepancy during his closing argument, in response to which the State was silent.

For these reasons, we conclude that, even if the jury was left with some misimpression from the officer's testimony, Leonard chose not to correct the misimpression either by impeaching the officer through the Mr. Horner's written statement or simply through Mr. Horner. Therefore, Leonard has not met his burden to prove that he raised this challenge below or otherwise that his right to meaningfully cross-examine Mr. Horner was hindered.

B.    Whether the Trial Court Should Have Dismissed the Charges Because the State Mishandled Discovery

13

Leonard contends that government mismanagement resulted in delays proceeding to trial. He asserts that, pursuant to CrR 8.3(b), his convictions must be reversed and the charges against him dismissed due to this mismanagement. We disagree.

1. Additional Factual Background

Approximately two months before trial, the State provided Leonard's counsel its witness list.  Then a few days before trial, Leonard's counsel noticed that the State did not provide some photos from the car crash scene as part of discovery, and the photos may have been taken of relevant items such as the bandana, and other "clothing items."  Leonard did not receive these photos for the approximately eight months when counsel was preparing for trial.  The State explained it thought Leonard received these photos, but it then promptly provided the photos Leonard requested.  Leonard moved to dismiss under CrR 8.3(b) because the delay was "a pure discovery violation."  CrR 3.3 went unmentioned.

The court continued the trial to allow Leonard the time to review this newly produced evidence.  The court further ordered that the late-discovered photographs be suppressed, unless Leonard and only Leonard wanted to introduce them.  In other words, the court prohibited the State from introducing evidence in its possession that Leonard was unable to prepare to argue on the eve of trial.

2. Discussion

Leonard argues that the State's delays in providing the witness list and the photographic evidence forced him to choose between his right to a speedy trial

14

and his right to prepared counsel. We disagree because he fails to articulate a cognizable claim for the relief he requests, i.e., dismissal.

Criminal Rule 3.3 governs time-to-trial requirements in Washington. The rule provides that when a charge is not brought to trial within the time limits set forth therein, that charge "shall be dismissed with prejudice." CrR 3.3(h). However, and significantly, CrR 3.3(h) provides that "[n]o case shall be dismissed for time-to-trial reasons *except as expressly required by this rule, a statute, or the state or federal constitution*." (Emphasis added.)[7] Below and on appeal, Leonard did not and does not identify, or explain, the violation of CrR 3.3, any statute or the state or federal constitution underlying his request for dismissal.[8]

Instead, Leonard simply makes repeated references to his right to a "speedy trial so his counsel could be prepared" and a generic "right to a fair trial," without anywhere explicating how CrR 3.3, any statute, or a constitutional provision was violated. Leonard does not assert a speedy trial claim pursuant to either the Sixth Amendment to the United States Constitution, or article I, section 22 of our state constitution. State v. Shemesh, 187 Wn. App. 136, 144, 347 P.3d 1096 (2015).[9]

---

[7] Our Supreme Court amended the time-for-trial rule in 2003 based on the recommendations of the Time-for-Trial Task Force. See State v. Kone, 165 Wn. App. 420, 435, 266 P.3d 916 (2011).

[8] "[T]his procedural right is not self-executing and requires that a motion be filed to exercise it in accordance with the procedure outlined in the rule." State v. Walker, 199 Wn.2d 796, 804, 513 P.3d 111 (2022). Namely, under CrR 3.3(d)(3), "[a] party who objects to the date set upon the ground that it is not within the time limits prescribed by this rule must, within 10 days after the notice is mailed or otherwise given, move that the court set a trial within those time limits." That did not happen here and, as it was not raised by the parties, we decline to address this additional failure.

[9] Had he articulated a violation of his *Sixth Amendment* right to a speedy trial, we would have undertaken a two-part inquiry. State v. Iniguez, 167 Wn.2d 273, 283-

Moreover, he nowhere asserts that he was either completely deprived of counsel, see United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), or that his counsel was ineffective. See Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Leonard's claim of error is premised on CrR 8.3(b). This rule provides that "[t]he court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." CrR 8.3(b). But, CrR 3.3(b), we have held, "provides the exclusive means to challenge a violation of the time-to-trial rule." State v. Kone, 165 Wn. App. 420, 437, 266 P.3d 916 (2011).

It is additionally problematic that Leonard attempts to obtain reversal of his convictions and dismissal of the charges against him by characterizing a claim of error regarding trial delay as one of "government mismanagement." Even if he had asserted a CrR 3.3 violation, and undertaken the right analyses, we have previously rejected the assertion that dismissal of charges was warranted for purported government mismanagement prejudicing a defendant's so-called "right to a speedy trial" pursuant to CrR 3.3. Kone, 165 Wn. App. at 435-37.

---

84, 217 P.3d 768 (2009). First, we would have determined whether "the length of the delay crossed a line from ordinary to presumptively prejudicial." Id. If such a line was crossed, then we would have applied the non-exclusive, four-factor Barker balancing test to determine if a constitutional violation occurred. Id. Namely we would have considered (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of their right, and (4) prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). No such analysis occurred below or in Leonard's briefing on appeal.

Finally, and tellingly, in support, Leonard cites inter alia to State v. Whitney, 96 Wn.2d 578, 580, 637 P.2d 956 (1981), State v. Michielli, 132 Wn.2d 229, 239-240, 937 P.2d 587 (1997), and State v. Sherman, 59 Wn. App. 763, 769, 801 P.2d 274 (1990). This judicial authority is unavailing as it preceded our Supreme Court's 2003 amendments to CrR 3.3. This court has rejected arguments relying on decisional authority preceding the 2003 amendments to the rule. See, e.g., State v. Thomas, 146 Wn. App. 568, 576, 191 P.3d 913 (2008).[10]

Thus, we reject Leonard's contention that the court erred in denying his motion to dismiss under CrR 8.3(b) because the plain language of CrR 3.3(h) "specifically prohibits dismissal for time-to-trial reasons unless expressly required" on grounds Leonard nowhere articulates. Thomas, 146 Wn. App. at 575.

C.    Whether the State Committed Misconduct in Closing Argument

1.    Law

"In the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" Fisher, 165 Wn.2d at 747 (quoting State v. Gregory, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), overruled on other grounds by State v. W.R., Jr., 181 Wn.2d 757, 760, 336 P.3d 1134 (2014)). "We review allegedly improper comments in the context of the entire argument." Id. "References to evidence outside of the record and bald appeals to passion and prejudice constitute misconduct." Id.

---

[10] Leonard also cites to State v. Brooks, 149 Wn. App. 373, 386, 203 P.3d 397 (2009). We decline to follow Brooks because it relies likewise on judicial authority pre-dating the 2003 amendments to CrR 3.3.

"The burden rests on the defendant to show the prosecuting attorney's conduct was both improper and prejudicial." Id. at 747. "If the defendant objected to the offending statement at trial, he must establish that the 'misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.'" State v. Slater, 197 Wn.2d 660, 681, 486 P.3d 873 (2021) (quoting State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)).

In Slater, our Supreme Court reviewed how federal courts and our state courts treat flight evidence to justify an inference of a defendant's consciousness of guilt. Id. at 667. Our Supreme Court approvingly explained the following three principles and guidance.

First, "while flight evidence may be considered by the jury, the court must not *instruct* the jury that flight evidence is conclusive proof of guilt." Id. at 668 (citing Hickory v. United States, 160 U.S. 408, 420, 16 S. Ct. 327, 40 L. Ed. 474 (1896)) (emphasis added).

Second, "[i]t is an accepted rule that evidence of the flight of a person, following the commission of a crime, is admissible and may be considered by the jury as a circumstance, along with other circumstances of the case, in determining guilt or innocence." Id. at 668 (quoting State v. Bruton, 66 Wn.2d 111, 112, 401 P.2d 340 (1965)). Further, our Supreme Court elaborated that that "accepted rule" requires that:

> the circumstance or inference of *flight* must be *substantial and real*. It may not be speculative, conjectural, or fanciful. In other words, the evidence or circumstances introduced and giving rise to the contention of flight must be substantial and sufficient to create a *reasonable and substantive inference* that the defendant's departure from the scene of difficulty was an instinctive or impulsive reaction to

18

a consciousness of guilt or was a deliberate effort to evade arrest and prosecution.

Id. at 668 (emphasis added) (some alterations in original) (quoting Bruton, 66 Wn.2d 112-113).[11]

Third, our Supreme Court approvingly surveyed cases that "opined that flight evidence is admissible as evidence of consciousness of guilt in other cases. Examples include cases in which the defendant flees the scene of the crime, escapes police contact, travels to a different state, or evades arrest for a significant period of time, among others." Id. at 669-70. Further, it cited a case holding that a flight instruction was proper when "'shortly after the robbery and prior to the arrest [police and the victim] spotted the defendant running along the shoulder of the freeway.'" Id. at 670 (alteration in original) (quoting State v. Nichols, 5 Wn. App. 657, 659, 491 P.2d 677 (1971)).

Ultimately, "[a] trial court when faced with proposed flight evidence must decide whether or not the alleged evidence amounts to flight that supports a consciousness of guilt *inference*. If it does amount to flight evidence that supports a consciousness of guilt inference, the judge may allow the evidence to be considered by the jury." Id. (emphasis added).

2. Discussion

---

[11] This court in Freeburg examined a Fifth Circuit decision that laid out a four-step test to examine the probative value of flight evidence: "the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." State v. Freeburg, 105 Wn. App. 492, 498, 20 P.3d 984 (2001) (quoting United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977)).

Leonard argues that the State committed misconduct by making an unsupported inference of guilt from the evidence he fled the scene. We disagree.

In closing, the State argued:

the defendant knew that he had to go. That vehicle had to flee because he knew he had just tried to rob two ladies trying to make a living selling cherries, that he held a gun to a family, a husband and a wife and a child; and *he knew that he needed to get out of that area, get out of dodge –*

(Emphasis added).

Leonard's trial counsel objected. After the court excused the jury, the court held a colloquy.

Leonard's counsel argued:

I'm very concerned that [the State], repeatedly, is putting thoughts in Mr. Leonard's head, arguing facts not in evidence: "He knew he had to get out of there." I think the case law, the defendant was thinking to himself, and then, of course, the prosecutor makes up something sinister, there's a line of cases, *Walker*, *Glassman*, *Pierce*, *Jones*, *Bohning*, *Russell* in regards to the facts not in evidence, but there's no facts in evidence of *what he knew or thought*. I think it crosses some lines. I'd ask that the State be told to refrain from such information and that the jury being disregard -- or be asked to disregard it.

(Emphasis added).

The court overruled Leonard's objection, with a caveat:

But when we start talking too much about what the defendant knew or didn't know, you're allowed to make reasonable inferences; so I'm going to overrule the objection at this time. But I will caution you to just be cognisant [sic] of your comments.

When the jury returned, the State concluded its closing argument:

the defendant who was extricated as the passenger in that vehicle, in fact, was fleeing from law enforcement because the defendant was involved in two armed robberies, although he did not get away with

20

any money, and because he assaulted a family with a firearm. *The very fact of the fleeing is circumstantial evidence of his guilt.*

(Emphasis added).

We hold that these statements were not improper for the following reasons.

First, consistent with the principle elucidated by our Supreme Court in Slater, the court did not allow the State to say (let alone instruct the jury) that Leonard's flight was *conclusive* of guilt. 197 Wn.2d at 668. The State simply indicated evidence was "circumstantial evidence" of guilt.

Second, we hold that the evidence of flight was "substantial and real" and created a "reasonable and substantive inference" that Leonard departed both due to an "instinctive or impulsive reaction to a consciousness of guilt" and as part of "a deliberate effort to evade arrest and prosecution." Id. (quoting Bruton, 66 Wn.2d 112-113). Here, the cherry stand attendants and then law enforcement testified to seeing Leonard run from the cherry stand immediately after the robbery and then lead the police in a dangerous high-speed chase for several miles.

In response, as his counsel asserted below, Leonard argues that the record includes no evidence of his actual state of mind at the time of the robbery and ensuing car chase. But, direct evidence of a defendant's state of mind is not the test. An inference of consciousness of guilt is sufficient. Slater, 197 Wn.2d at 670. Here, the State did not make a "bald" and unsupported assertion. Fisher, 165 Wn.2d at 747. On the contrary, on the facts presented above, the inference here is reasonable, substantive and sufficient.

Finally, this case is unlike in Bruton, where the defendants merely exited a store after being accused of shoplifting, and then "walked up the street." Bruton,

21

66 Wn.2d at 113. There, the State provided no testimony about the circumstances of their exit from the store. Id. The full context of the facts presented at trial support the necessary inference above and, thus, defeat Leonard's misconduct claim.

D.     VPA

Leonard argues in his reply brief that we should strike his $500 Victim Penalty Assessment.

Formerly, RCW 7.68.035(1)(a) mandated a $500 VPA for all adults found guilty in superior court of a crime. State v. Mathers, 193 Wn. App. 913, 918, 376 P.3d 1163 (2016). In 2023, our legislature amended section .035 to state that "[t]he court shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3)." LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(4). This change took effect on July 1, 2023, but applies to Leonard because his appeal was pending at the time. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023) (the legislature's VPA amendment applied to the defendant because the case was still on direct appeal).

Here, there is no dispute that the trial court found Leonard indigent on June 29, 2020 or that the VPA was imposed prior to the 2023 amendments, and the State did not oppose Leonard's request to strike the VPA at oral argument or otherwise. Accordingly, we remand this matter to the trial court to strike the VPA.

### III.     CONCLUSION

We affirm the trial court but remand solely to strike Leonard's VPA.

Díaz, J.

WE CONCUR:

Feldman, J.            Coburn, J.