IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>             Respondent,<br><br>      v.<br><br>YUSUF ABDULLAHI,<br><br>             Appellant. | No. 85874-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Yusuf Abdullahi was convicted of felony physical control of a vehicle while under the influence. He seeks reversal of his conviction on three bases. First, he claims the trial court erred when it admitted his statements to police obtained in violation of his constitutional right to remain silent. Second, he claims the trial court erred when it admitted his blood test results, either because government misconduct rendered the results unreliable or because the mismanagement forced Abdullahi to choose between his right to a speedy trial and competent representation. He asserts these cumulative errors deprived him of his right to a fair trial. Finally, he challenges his sentence, as the combined period of incarceration and community custody exceeds the statutory maximum. We affirm the conviction but remand for the trial court to amend the term of the community custody condition, as it exceeds the statutory maximum.

FACTS

At approximately 9:00 a.m. on July 6, 2022, a citizen called 911 to report a vehicle blocking traffic in the right-hand southbound lane in which the driver was "slumped over" on Rainier Avenue South in Seattle, Washington. Seattle Police Department (SPD) Officers Elizabeth Scott and David Lindner responded shortly thereafter and discovered a Ford Taurus illegally stopped and blocking that lane of traffic.

Before approaching the Taurus, the officers parked one of their vehicles behind it and another in front of it and activated their emergency lights. When the officers exited their vehicles and approached the Taurus, they observed the keys in the ignition and a man, later identified as Abdullahi, unconscious in the driver's seat. Due to the noise of nearby traffic, they could not discern whether the vehicle was running. They also observed "a pipe . . . commonly used with narcotics" in the center console with a lighter in the passenger seat. At that point, the officers went back to their vehicles and repositioned them closer to the Taurus to block it in.

Once the vehicles were repositioned, Scott and Lindner roused Abdullahi by knocking on the passenger window. Abdullahi appeared to interact with his keys, but Scott and Lindner were unsure what he was attempting. A little less than twenty seconds into the interaction, the officers ordered him to step outside of the vehicle, and he complied. Upon exiting, Abdullahi stated he had "run out of gas." The officers met him on the driver's side of the vehicle, placed him in handcuffs, and moved to the sidewalk. As this series of events took place, Scott asked about how Abdullahi ran out of gas and who, if anyone, was going to retrieve more. She also asked about the "crack

2

pipe" in the center console and inquired if Abdullahi "had done any drugs." As Scott asked Abdullahi questions, he clarified the pipe was for methamphetamine and claimed to have smoked "last night."

During this exchange, Abdullahi also shared with the officers that his uncle Ismael left "to go get gas." After approximately a minute and a half, Scott moved Abdullahi to a nearby parking lot while Lindner repositioned his patrol vehicle nearby. Abdullahi also gave Lindner permission to attempt to turn on the Taurus. Although it took two tries, the engine did turn on, and the gas gauge reflected there was "around like a quarter of a tank" of gas remaining. Scott attempted to contact Ismael twice using Abdullahi's cell phone, but both attempts were unsuccessful. After approximately two minutes in the parking lot, where Scott had continued asking questions, Abdullahi was placed in the back of Lindner's patrol vehicle. Lindner told him that they "were still doing an investigation." Scott also advised Abdullahi of his Miranda[1] rights at that time. Abdullahi was then placed under arrest for being in physical control of a vehicle while under the influence.

On the ride to the station, Abdullahi told Scott that he smoked methamphetamine throughout the previous night and that upon seeing the officers arrive on the scene, he also swallowed two grams of methamphetamine. This information prompted Scott to request the Seattle Fire Department to evaluate Abdullahi. After some time, Scott transported Abdullahi to Harborview Medical Center, where a nurse took blood samples. Scott then drove Abdullahi to the King County Jail, but they asked that she take Abdullahi back to the hospital for evaluation due to his comments regarding swallowing

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

methamphetamine. Scott then returned with Abdullahi to the hospital for further monitoring. Once he was discharged, SPD Officer Tyler Piper transported Abdullahi back to jail. During that transport, Abdullahi stated to Piper that at the time of the arrest, he was using methamphetamine.

At a CrR 3.5 hearing, the State moved to admit statements Abdullahi had made before he received Miranda warnings. The trial court found Abdullahi's statements during the initial phase, when Abdullahi was handcuffed next to his car on Rainier Avenue, were admissible. However, the court excluded his statements during the interaction that followed, when Abdullahi was questioned in the nearby parking lot. Thus, the State was permitted to introduce Abdullahi's pre-Miranda statements concerning running out of gas, the whereabouts of his uncle, and the use of the pipe to smoke methamphetamine "last night."

The Washington State Toxicology Lab ("Toxicology Lab") examined Abdullahi's blood and determined it tested "positive for methamphetamine with a quantitative value of 0.36 milligrams per liter," a level that indicates recreational rather than therapeutic use. The results also tested positive for amphetamine at 0.058 milligrams per liter. At the time Abdullahi's blood was tested, August 2022, the Toxicology Lab in Seattle had been addressing an ongoing methamphetamine contamination since 2018. The most recent discrepant result for methamphetamine prior to the test of his blood had been in April 2022.

Based on the Toxicology Lab's contamination issues and Abdullahi's own positive test result, in April 2023, he brought a CrR 8.3(b) motion to dismiss based on alleged government mismanagement at the Toxicology Lab and the State's failure to

4

disclose Brady[2] material. In the alternative, Abdullahi moved to exclude the testing results from the blood processed at the Toxicology Lab, alleging the results were unreliable. In August 2023, the trial court held a hearing on the motion. Abdullahi presented the testimony of expert Janine Arvizu, a chemist and auditor who assessed Abdullahi's blood test results. The State's witnesses were Amanda Black, quality and assurance manager at the Toxicology Lab, and Brian Capron, the former Acting Director of the Toxicology Lab during the relevant period. The witnesses testified about a variety of remediation efforts the Toxicology Lab undertook, but acknowledged there were still unanswered questions concerning the root cause of the contamination.

The trial court denied both motions. For the CrR 8.3(b) motion, the court found by a preponderance of the evidence that the Toxicology Lab's inability to resolve the source of the contamination constituted governmental mismanagement. Also, the court found it was mismanagement to ignore recommendations from the National Institute for Occupational Safety and Health (NIOSH). A letter from NIOSH recommended that the Toxicology Lab "[r]eview" its laboratory pressurization, stating "it may be ideal" to maintain relative pressurization "to minimize the potential for migration of hazardous evidence contents." However, it held Abdullahi could not establish actual prejudice on either ground he argued—because government mismanagement of the Toxicology Lab rendered the results unreliable or because it forced Abdullahi to choose between his speedy trial rights or competent counsel.

The trial court also held that because the NIOSH letter recommending the Toxicology Lab review the pressurization of the impacted labs suggested government

---

[2] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

mismanagement, "the letter could have impeachment value," so the State should have disclosed it . However, Abdullahi could not establish the materiality prong under Brady, as Abdullahi had been aware of the letter since January 2023 and "had ample opportunity to work with [his] expert to develop theories about the letter's import." Ultimately, the court concluded suppression of the blood test results was a "maladapted remedy" for the failure to disclose the letter and instead suggested that Abdullahi "can and should be able to use the letter to attack the credibility of the blood test result here."

At trial, on cross-examination of the State's witness Kelly Palen, a forensic scientist with the Toxicology Lab, concerning the initial and ongoing contamination issues, Abdullahi elicited testimony that the Toxicology Lab never definitively learned the source of the contamination. Abdullahi's expert Arvizu testified that Abdullahi's blood test results were not reliable given the ongoing contamination issues.

The jury convicted Abdullahi of felony physical control while under the influence.[3] However, by special verdict, the jury found Abdullahi not guilty as to the rapid recidivist aggravator, i.e., of committing the crime shortly after being released from incarceration. Abdullahi was sentenced to a 56-month term of incarceration to be followed by 12 months of community custody. Abdullahi timely appeals.

## DISCUSSION

Abdullahi challenges his conviction on three grounds. First, he contends the trial court erred in admitting his pre-Miranda statements, wherein he admitted he had smoked methamphetamine the night before his arrest and that the pipe near him in the car was a "meth pipe." Second, he contends the trial court erred when it did not exclude

---

[3] Abdullahi stipulated that he had been convicted of "three or more prior offenses within ten years," which elevated the offense to a felony.

the Toxicology Lab results pursuant to his CrR 8.3(b) motion, as he was prejudiced either because government mismanagement yielded unreliable test results or forced him to choose between his speedy trial rights and competent counsel. He also argues that his combined sentence and community custody exceed the statutory maximum, necessitating remand.

## I.      Admission of Pre-*Miranda* Statements

Abdullahi argues that the court erred in admitting his statements to Officers Scott and Lindner that were made without the benefit of Miranda warnings because the detention went beyond a typical Terry[4] stop, and a reasonable detainee in his circumstances would have considered themselves under arrest, or in "custody," when he was handcuffed and questioned. The State counters that the officers' questions and actions were permissible to ensure safety and to investigate their suspicion of criminal activity. We hold that the court did not err by admitting the statements and that any error was harmless.

The federal and Washington State Constitutions guarantee the right against self-incrimination. U.S. CONST. amends. V, VI, XIV; WASH. CONST. art. I, § 9. Miranda warnings were developed to protect the right against self-incrimination "while in the coercive environment of police custody." State v. Heritage, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). Thus, without Miranda warnings, statements made during custodial interrogation may not be used as evidence against the person in a criminal trial. State v. Escalante, 195 Wn.2d 526, 532, 461 P.3d 1183 (2020) (citing Miranda, 384 U.S. at 479).

---

[4] Terry v. Ohio, 392 U.S. 1, 10, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The protections provided by Miranda apply only to a "(1) custodial (2) interrogation (3) by an agent of the State." Heritage, 152 Wn.2d at 214.[5] " 'Custodial' refers to whether the defendant's movement was restricted at the time of questioning." State v. Lorenz, 152 Wn.2d 22, 36, 93 P.3d 133 (2004) (citing State v. Sargent, 111 Wn.2d 641, 649, 762 P.2d 1127 (1988)). "An objective test is used to determine whether a defendant was in custody—whether a reasonable person in the individual's position would believe he or she was in police custody to a degree associated with formal arrest." Id. at 36-37 (citing Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) ("defendant must show some objective facts indicating his . . . freedom of movement [or action] was restricted [or curtailed]")).

However, "not all police interviews are custodial." State v. Rotko, 116 Wn. App. 230, 241, 67 P.3d 1098 (2003). Under Terry, "a law enforcement officer may temporarily detain an individual suspected of criminal activity if the officer can point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " Escalante, 195 Wn.2d at 537 (quoting Terry, 392 U.S. at 21). Such routine, on-the-street "Terry stops" or comparable traffic stops do not necessarily rise to the level of "custody" for the purposes of Miranda. Heritage, 152 Wn.2d at 219. Although these encounters curtail freedom such that a person may not feel free to leave the scene, they tend to not qualify as police interrogations that trigger Miranda warnings because they are relatively brief, occur in public, and are "substantially less 'police dominated.' " Heritage, 152 Wn.2d at 218 (quoting Berkemer,

---

[5] In its brief, the State acknowledges that Officers Scott and Lindner "were obviously State agents" and "that their questions were likely to elicit an incriminating response, and thus constituted interrogation." State v. Sargent, 111 Wn.2d 641, 650, 762 P.2d 1127 (1988). Therefore, "[t]he only issue is whether Abdullahi was in 'custody' when these statements were made."

468 U.S. at 439). Thus, "a detaining officer may ask a moderate number of questions during a Terry stop to determine the identity of the suspect and to confirm or dispel the officer's suspicions without rendering the suspect 'in custody' for the purposes of Miranda." Id. Officers may also "take such steps as [are] reasonably necessary to protect their personal safety." Escalante, 195 Wn.2d at 537 (quoting United States v. Hensley, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985)).

First, Abdullahi challenges a single factual finding by the trial court after the CrR 3.5 hearing:

> Officer Lindner has experience with individuals who have been found passed out in the driver's seat of vehicles. Upon awakening, the drivers have rammed other cars in order to drive away. He believed Mr. Abdullahi was under the influence and was exiting onto a busy street. In his experience, a person can be calm in one second and can bolt the next second. Officer Lindner had safety concerns for the officers as well as Mr. Abdullahi.

This court reviews a trial court's challenged findings of fact from a CrR 3.5 hearing to determine if they are supported by substantial evidence. State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). "Substantial evidence" means evidence "sufficient to persuade a fair-minded, rational person of the finding's truth." State v. Pratt, 11 Wn. App. 2d 450, 457, 454 P.3d 875 (2019). Unchallenged findings are verities on appeal. Lorenz, 152 Wn.2d at 30.

At the CrR 3.5 hearing, Lindner testified that he had received DUI-specific training. He stated that he had encountered people under the influence of drugs such as methamphetamine in his day-to-day work and had observed how the use of drugs such as methamphetamine contributes to people acting erratically. Specifically, Lindner testified that he had experienced numerous occasions where people passed out in

9

vehicles attempted to flee in their vehicle upon being woken up. Lindner suspected Abdullahi was impaired based on the illegal positioning of the vehicle, his unconscious state despite the busy surroundings, and the presence of drug paraphernalia. He further testified that he saw the keys were in the ignition of the vehicle upon arriving at the scene, and he worried that heavy traffic outside the driver's door made it unsafe for himself, Scott, and Abdullahi, so Abdullahi was placed in handcuffs.

This evidence is sufficient to persuade a fair-minded, rational person that Lindner had experience with individuals passed out in their vehicles and acting erratically due to being under the influence of either drugs or alcohol. Additionally, Lindner's testimony is supported by video evidence, which corroborated Abdullahi was either asleep or incapacitated in the driver's seat of a vehicle that was blocking a lane of traffic and was within reach of apparent drug paraphernalia. In an unchallenged finding, the trial court also separately found that "the busy street was not a safe place to be," which further supports Lindner's safety concerns. We conclude that substantial evidence supports the challenged finding.

Next, we review de novo whether the trial court's conclusions of law are supported by its factual findings. State v. Rosas-Miranda, 176 Wn. App. 773, 730-31, 309 P.3d 728 (2013). "In evaluating the reasonableness of an officer's suspicion, [this court] looks to the totality of the circumstances known to the officer." State v. Pines, 17 Wn. App. 2d 483, 490, 487 P.3d 196 (2021) (citing State v. Fuentes, 183 Wn.2d 149, 158, 352 P.3d 152 (2015)). Reasonableness is "based on the objective view of the known facts, not the officer's subjective belief or ability to correctly articulate his suspicion in reference to a particular crime." Id.

Here, the findings establish that in many respects, the officers' interactions with Abdullahi fell within the recognized confines of a limited investigatory stop.[6] Visibility to other motorists and passersby " 'reduces the ability of an unscrupulous [police officer] to use illegitimate means to elicit self-incriminating statements and diminishes the [suspect's] fear that, if he does not cooperate, he will be subjected to abuse.' " Escalante, 195 Wn.2d at 541 (discussing traffic stops) (quoting Berkemer, 468 U.S. at 438)). Abdullahi and Scott were visible to the public during the questioning. Further, "[t]he fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability." Berkemer, 468 U.S. at 438. Here, when Scott initially spoke with Abdullahi, they were a few feet away from the parked vehicles, with Lindner standing nearby. Otherwise, no additional officers were present.

Further, "[t]he detention must not exceed the duration and intensity necessary to confirm or dispel the officer's suspicions." State v. Mitchell, 80 Wn. App. 143, 145, 906 P.2d 1013 (1995). Here, the "first phase" of questioning, after Abdullahi got out of the car and was moved to the vacant lot, lasted approximately one minute and 48 seconds. Compare State v. Wheeler, 108 Wn.2d 230, 237, 737 P.2d 1005 (1987) (holding that under the circumstances of the case, a five- to ten-minute detention did not exceed the scope of a Terry stop). Scott's limited questioning focused on determining why the vehicle was stopped and investigating the possibility that Abdullahi had a medical emergency, as the 911 caller described him as "slumped over." Upon exiting the vehicle, Abdullahi had claimed his uncle Ismael had left to retrieve gas. Thus, Scott asked about

---

[6] Because these findings are unchallenged, they are verities on appeal. Lorenz, 152 Wn.2d at 30.

Abdullahi running out of gas and about his uncle.[7] Likewise, Scott's question concerning when Abdullahi had last done any drugs was prompted by his lack of response when the officers first approached his vehicle and the pipe was in plain view. Again, the questioning was geared toward confirming or dispelling any suspicion that Abdullahi was currently under the influence of any substance. Scott spoke with Abdullahi in a calm voice. Further, although Scott and Lindner were armed with service weapons, neither drew them or made any threatening or aggressive movements.

Abdullahi also points to the facts that officers boxed in his vehicle and handcuffed him upon exiting his vehicle to support his argument that a reasonable person in his position would believe they were in police custody to a degree associated with formal arrest. Officers may take reasonable steps during a Terry stop to protect their safety. Escalante, 195 Wn.2d at 537 (quoting Hensley, 469 U.S. at 235). And although a Terry stop is ordinarily limited to a frisk for weapons and brief questioning, handcuffing may be appropriate "when the police have a reasonable fear of danger." Mitchell, 80 Wn. App. at 145-46 (citing State v. Williams, 102 Wn.2d 733, 740 n.2, 689 P.2d 1065 (1984)). The scope of the intrusion permitted must be proportional to the circumstances of each case. Mitchell, 80 Wn. App. at 146.

Abdullahi analogizes to Pines, where this court held a seizure and subsequent search of a defendant went beyond a valid Terry stop and constituted custodial arrest. 17 Wn. App. 2d at 489-90. In Pines, the defendant was recognized by a passing officer who was aware of a warrant for his arrest. Id. at 487. After following the defendant to a restaurant, three uniformed officers entered the building after the defendant and tackled

---

[7] His explanation about the gas prompted Lindner shortly thereafter to attempt to turn the vehicle on, at which point he discovered it had a quarter tank of gas.

him to the ground, held him down by the neck and head, and handcuffed him. Id. As they were handcuffing him, a different officer yelled out, "you're under arrest for your felony warrant." Id. While being held on the ground and prior to being provided Miranda warnings, the defendant admitted in response to police questioning that he had a gun on his person. Id. at 487-88. The court held under these circumstances, an individual would consider themselves under custodial arrest. Id. at 493. It reasoned that arresting officers did not observe the defendant carrying a weapon, and no officer testified they feared for their safety prior to the defendant's seizure or that they had seen a weapon prior to their search, countering the State's argument that this could qualify as a lawful Terry stop. Id. at 492-93. Furthermore, there were three uniformed police officers along with another detective at the scene, and they forcefully took the defendant to the ground and handcuffed him, while another officer yelled the defendant was under arrest. Id.

Though officers' actions need not be as egregious as those in Pines to exceed a valid Terry stop, the circumstances here were not such that a reasonable person under the circumstances would believe they were under custodial arrest. Unlike the officers in Pines, who could not testify to any safety concern prior to the defendant's seizure, the officers here enunciated a reasonable fear of danger for themselves and others once Abdullahi exited the vehicle. Scott and Lindner can be heard on the body camera footage discussing boxing the vehicle in to avoid being exposed to traffic on Rainier Avenue and to address concerns that Abdullahi might attempt to drive away. The police emergency lights also aided in addressing the potential safety hazard from the stopped cars blocking traffic. While handcuffing Abdullahi may not have been necessary, as both Scott and Lindner confirmed Abdullahi had complied with commands, it was in keeping

13

with a reasonable concern for safety as they were moving Abdullahi from a vehicle in the middle of a busy street. Considering all of the circumstances, the officers' actions while initially detaining and questioning Abdullahi were justified as part of a valid Terry stop. Therefore, the trial court did not err in admitting Abdullahi's pre-Miranda statements during the "initial phase" of questioning.

Moreover, "admitting a confession elicited in violation of Miranda may be harmless error." State v. France, 121 Wn. App. 394, 400, 88 P.3d 1003 (2004). "To find an error affecting a constitutional right harmless, we must find that the error was harmless beyond a reasonable doubt." Id. at 400-01. This standard is met only if the State can show that the untainted evidence is so overwhelming it necessarily leads to a guilty verdict. Id. at 401.

Here, the State presented ample evidence that supported Abdullahi was intoxicated even without his pre-Miranda admissions. To prove physical control of a vehicle while under the influence, RCW 46.61.504 requires the person be in "actual physical control of a vehicle within this state . . . while the person is under the influence of or affected by . . . any drug." RCW 46.61.504(1)(c). Laboratory testing confirmed Abdullahi had recently used methamphetamine at recreational levels. Abdullahi also made two other statements in which he admitted using methamphetamine the previous night and shortly before his arrest. Despite referencing the pre-Miranda admission during closing,[8] the State primarily focused on the final two admissions[9] or referenced

---

[8] For instance, the State argued, "He told officers that he had smoked methamphetamine the night before."; retold Abdullahi's statement that he smoked methamphetamine the night before; again referenced statements that he smoked the day prior; and described him as "someone who told you he smoked methamphetamine that night."

[9] Indeed, the State referenced "his admissions to smoking methamphetamine" and his comments to Officer Scott that "he swallowed two grams of methamphetamine. . . . And then he tells her that he

14

Abdullahi's admissions generally without relying directly on the pre-<u>Miranda</u> statements.[10] Additionally, the circumstantial evidence of Abdullahi's being found incapacitated, within arm's reach of drug paraphernalia on a busy road, as well as his delay in responding to the officers when they first arrived with their lights on, further supported a reasonable inference that Abdullahi was intoxicated while in control of a vehicle.

Given Abdullahi's other properly admitted admissions of methamphetamine use, the blood test result, and other indicia of intoxication, we conclude that the untainted evidence is so overwhelming that it would necessarily lead to a guilty verdict. Any error in the State's reliance on the pre-<u>Miranda</u> statements as evidence of intoxication was harmless.

## II. Denial of CrR 8.3(b) Motion to Dismiss

Abdullahi argues the trial court erred in denying his motion to exclude his blood test results pursuant to CrR 8.3(b). CrR 8.3(b) states:

> The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial. The court shall set forth its reasons in a written order.

"The dismissal of charges under CrR 8.3(b) is an 'extraordinary remedy.' " <u>State v. Kone</u>, 165 Wn. App. 420, 432, 266 P.3d 916 (2011) (quoting <u>State v. Rohrich</u>, 149

---

smoked methamphetamine throughout the night." Later, the State again referenced Abdullahi swallowing the methamphetamine and that "he smoked methamphetamine either before his arrest or smoked methamphetamine that—that day."

[10] For example, the State made general references to Abdullahi's admissions, such as "Abdullahi told us multiple times that he smoked methamphetamine."; "He smoked methamphetamine. Why do we know this? Because he told us over and over again."; and "he tells us—I smoked last night; I smoked throughout the night; I smoked before I was arrested."

Wn.2d 647, 658, 71 P.3d 638 (2003)). Suppression of evidence is additionally available as an "intermediate remedial step" to cure any alleged prejudice. City of Seattle v. Holifield, 170 Wn.2d 230, 237, 240 P.3d 1162 (2010).[11]

Under CrR 8.3(b), a trial court may dismiss charges if "the defendant shows by a preponderance of the evidence (1) 'arbitrary action or governmental misconduct' and (2) 'prejudice affecting the defendant's right to a fair trial.' " Rohrich, 149 Wn.2d at 654 (quoting State v. Michielli, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997)). "Governmental misconduct need not be evil or dishonest. Simple mismanagement is sufficient." Kone, 165 Wn. App. at 433 (citing State v. Blackwell, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993)). In proving prejudice, "the defendant must show actual prejudice, not merely speculative prejudice affected [their] right to a fair trial." Id. (citing Rohrich, 149 Wn.2d at 657). Under CrR 8.3(b), the burden is on the defendant to show actual, rather than speculative prejudice. Rohrich, 149 Wn.2d at 657-58.

"[This court] review[s] the trial court's decision to deny a motion to dismiss under CrR 8.3 for abuse of discretion, that is, whether the decision was manifestly unreasonable, based on untenable grounds, or made for untenable reasons." Kone, 165 Wn. App. at 433 (citing Michielli, 132 Wn.2d at 240; Blackwell, 120 Wn.2d at 830).

The State did not cross-appeal or otherwise challenge the court's determination that the government engaged in mismanagement both by ignoring NIOSH's "findings and recommendations to mitigate the 'potential for migration of hazardous evidence contents' and [failing to take] the appropriate remedial steps" and by failing "to present a

---

[11] In City of Seattle, the court concluded suppression of evidence was an intermediary step, applying CrRLJ 8.3(b). 170 Wn.2d at 236. As the language of CrRLJ 8.3(b) and CrR 8.3(b) is identical, the court relied on CrR 8.3 precedent. Id. at 238-39.

clear remedial plan" to address the past mismanagement that resulted in the State stipulating not to seek to admit reports between March 1, 2018 and October 27, 2021. Therefore, the sole issue on appeal is on the second prong under CrR 8.3(b), whether governmental misconduct prejudiced Adbullahi's right to a fair trial.

Abdullahi asserts he was prejudiced because the government engaged in misconduct by failing to appropriately remediate the methamphetamine contamination in the Toxicology Lab prior to testing Abdullahi's blood, which resulted in the admission of unreliable results. He contends he was therefore prejudiced "because his case was continued over his pro se objections so that defense counsel could hire an expert to investigate and educate the defense about the ongoing contamination issue at the toxicology lab and mount an effective defense." The State counters that the trial court acted within its discretion by concluding Abdullahi failed to establish prejudice on both issues.[12]

A.    Toxicology Lab Contamination and Remediation Efforts

At the CrR 8.3(b) hearing, both parties presented evidence concerning the Toxicology Lab, the associated methamphetamine contamination, and the subsequent remediation. The Washington State Patrol Crime Laboratory (Crime Lab) and the Toxicology Lab are positioned near one another in the same building and with a shared hallway, separated by approximately seven to eight feet. The Crime Lab "handles high levels of controlled substances," which tend to be seized evidentiary material. By

---

[12] On appeal, misconduct is not at issue. Although the State disagrees with the conclusion of the trial court that there was government mismanagement, it recognizes it did not appeal or otherwise challenge the trial court's finding and thus cannot relitigate the issue at this stage.

contrast, "the Toxicology Laboratory is a trace analysis laboratory" and "handles very, very low concentrations—nanogram level concentrations—of drugs."

Needing more room for its expanding operations, around March 2018, the Toxicology Lab moved some of its operations, including testing, into a place referred to as the "annex," where the Crime Lab previously was located. From September 2018 to June 2019, there were "three separate incidents" concerning "inconsistent meth results." The observed inconsistency was that the initial testing detected the amphetamine class of drugs,[13] while the confirmatory test did not. It was eventually discovered that the Crime Lab had previously utilized the annex to synthesize methamphetamine for training and likely contributed to a methamphetamine contamination of the space. The annex was decommissioned shortly after this discovery.[14]

Although it was initially believed only the annex was contaminated, discrepant results were obtained from Hood 1[15] in the main laboratory around June 2019 as well. These discrepancies were noticed because the "original testing . . . found high amounts of methamphetamine with no amphetamine," which is abnormal because the body ordinarily metabolizes the former into the latter. Subsequent retesting contained no methamphetamine, indicating the contamination occurred during the extraction process. Thus, the Toxicology Lab additionally placed Hood 1 out of service at the same time due to these discrepant results.

---

[13] As described by Brian Capron, the current manager of the Federal Way Toxicology Lab and the previous manager of the Seattle Toxicology Lab, amphetamines are central nervous system stimulants that could include methamphetamine, amphetamine, Ecstasy, pseudoephedrine, and ephedrine.

[14] While the record does not include a specific date, several witnesses testified that after the final discrepant result in June 2019, they moved out.

[15] The main Toxicology Lab contains eleven fume hoods or "extraction sample prep hoods," where analysts conduct some of their testing.

In response to the possibility of methamphetamine contamination, the Toxicology Lab brought in BioClean, a remediation contractor, to conduct sampling of the annex facility. The results of the sampling demonstrated widespread methamphetamine contamination throughout the office and laboratory workspaces.

BioClean engaged in targeted remediation, cleaning the hallways within the crime laboratory space and adjacent to the annex offices, Hood 1, and the entry and exit ports of the HVAC system.[16] The annex was "gutted," with BioClean removing all of the carpet, ceiling tiles, and furniture. However, they did not attempt to remediate the ducts of the HVAC system; instead, they cleaned and tested at the boundary of the duct work. In the main lab, the primary remediation concerned Hood 1. Overall, BioClean conducted three rounds of decontamination between 2019 and mid-2021 in response to discrepant test results.

Despite remediation efforts and decommissioning the annex, the Toxicology Lab noted a discrepant result in a urine sample in April or May of 2022. Urine is more prone to "carry-over" contamination, a phenomenon whereby samples have such high levels of a particular chemical that it can be "carried over" and recognized in subsequent samples that otherwise lack the chemical and are run on the same equipment. Although the Toxicology Lab speculated the discrepant results were due to "carry-over" contamination, the investigation was ultimately inconclusive. At the time of the hearing on the CrR 8.3(b) motion to dismiss, no further discrepant test results had been reported since April 2022.

---

[16] Heating, Ventilation, and Air Conditioning.

Beginning in 2021, the Toxicology Lab began participating in a larger background contamination study conducted by the National Institute for Standards and Technology (NIST). As part of the study, the Toxicology Lab initially collected and sent 100 randomly selected samples from "high-touch" areas throughout the facility. NIST independently analyzed the samples and determined four areas tested positive for methamphetamine.[17] The Toxicology Lab subsequently re-sanitized the grates, and new samples from the areas tested negative.

Since sending the initial 100 samples, the Toxicology Lab continued to send sample sets of 25 to NIST. NIST found no contamination in four different sample sets sent between December 2021 and August 2022.[18] In November 2022, a sample taken from work instruments near Hood 9 tested positive for oxycodone. This positive result prompted the Toxicology Lab to temporarily decommission the area, reclean, and retest. The follow-up sample tested negative for any contamination. Subsequently, the 25-set batches sent for testing in January 2023, February 2023,[19] and May 2023 also tested negative for any contamination.

Additionally, in response to request for a health hazard evaluation from the Toxicology Lab, a team from NIOSH evaluated the Toxicology Lab in June 2022 to determine if the contamination created potential health risks to lab personnel. NIOSH shared preliminary observations and recommendations in a letter dated June 28, 2022. The letter observed that the Toxicology Lab "laboratories were negatively pressured

---

[17] The areas that tested positive for methamphetamine were grates on the ceiling.
[18] Abdullahi's blood sample was processed on August 4, 2022.
[19] This was not a part of the quarterly test. Rather, a vendor came to work on the fume hoods during this time, and the Lab decided to swab nine hoods in two different places, resulting in 18 samples. NIST reported no positive results.

compared to the shared hallway[,] meaning that air flowed from the hallway into [the Toxicology Lab] laboratories," and the Crime Laboratory Division "Materials Analysis Section laboratories were positively pressure[d] compared to the shared hallway[,] meaning that air flowed from the Materials Analysis Section laboratories into the hallway." Accordingly, the letter recommended that management should "[r]eview laboratory pressurization relative to the hallways to ensure air is flowing as intended between spaces." It further recommended the Toxicology Lab consult with a laboratory design specialist to evaluate its airflow system.

B.    Prejudice from Government Mismanagement

At the hearing on the CrR 8.3(b) motion to dismiss, Abdullahi's expert Arvizu opined that methamphetamine testing performed at the lab after March 2018 was not accurate or reliable because the Toxicology Lab had not resolved the source of the contamination or the mechanism permitting the contamination and because it could not confirm "original specimens" were not directly contaminated and thus circumventing their preventative procedures. Ordinarily, BioClean is contracted to remediate sites to meet a minimum statutory threshold safe for human occupation. While there is no statutory minimum established for trace analysis laboratories like the Toxicology Lab[20] and no available contractor specializing in remediation to zero detectable methamphetamine, Arvizu testified that BioClean's thresholds were too high for standards within a trace-level analysis lab.[21]

---

[20] Rather, labs establish their own thresholds.

[21] Specifically, Arvizu testified that "when they're cleaning up a site to meet the Washington State threshold limit for surface contamination, that limit is established as 1.5 micrograms per hundred square centimeters. And they're very familiar with cleaning up a facility to meet that threshold. However, 1.5 micrograms, although it's not significant if it's on a surface in a residential environment, would be very

She further testified that the only way to assure the accuracy of positive test results is to send unopened second containers of evidence for independent testing, which the Toxicology Lab did not do in Abdullahi's case. Arvizu also opined that Abdullahi's test was unreliable until it could be conclusively proven that "in vitro" metabolism was impossible, even though she acknowledged that she did not find research that studied the specific "in vitro" conditions as in this case.[22]

Brian Capron, the former Acting Director of the Toxicology Lab during the relevant period, disagreed with Arvizu's opinion that the Toxicology Lab's secondary measures were insufficient to remediate the contamination. Regarding the initial discrepant results from Hood 1 in June 2019, Capron explained retesting of these samples indicated contamination likely took place at the extraction process. He stated:

> The follow-up testing did not identify methamphetamine in any of those samples it originally had. So the same tube was used, so we determined that it had to have happened somewhere during the extraction process, not the actual evidence item itself. Because if the evidence item itself had methamphetamine, it would have methamphetamine in it the second time that you test it.

He also noted that contamination concerns could be ruled out because Abdullahi's test results confirmed the presence of both methamphetamine and its "active metabolite," amphetamine. He explained that if it were just a methamphetamine contamination, the results would not also show amphetamine, as the metabolic processes necessary to produce amphetamine could not happen absent necessary

seriously much a concern in a trace level analysis lab because a microgram is orders of magnitude bigger than the nanogram levels that are tested in a trace laboratory."

[22] Arvizu also testified that ongoing air pressure variances between the labs and hallway could be one potential source for the contamination. However, the trial court determined that since she had no specific knowledge of the laboratory's HVAC system, she was unqualified to determine whether it "would meet the acceptable industry standard." Abdullahi does not challenge the court's ruling on this issue.

enzymes. He disagreed with Arvizu that methamphetamine could metabolize "in vitro," or outside the human body—for example, in a laboratory—as he had not seen peer reviewed literature that noted the metabolization of methamphetamine without the additional introduction of enzymes.

Capron acknowledged that it was possible for a person to take amphetamine separately from methamphetamine, but in that situation, there would be only amphetamine in the results. Additionally, if an individual took methamphetamine and amphetamine, "that would just add to [the individual's] amphetamine levels that are found in the blood." Ultimately, based on his review, Capron found Abdullahi's test results were consistent with a human who ingested methamphetamine and metabolized it into amphetamine, and the test results did not indicate environmental contamination at the laboratory.

The trial court concluded "it [was] government mismanagement to ignore [NIOSH's] findings and recommendations" concerning the pressurization issues and to not have a "clear remedial plan that addresses these outstanding questions." However, it disagreed the mismanagement was so egregious as to warrant dismissal, since there were "ad hoc controls in place to mitigate known risks about the methamphetamine contamination from March 2018 to October 2021."

The trial court further concluded that Abdullahi failed to establish prejudice. First, it determined Abdullahi did not show the blood test to be unreliable because "the State demonstrated, by a preponderance of the evidence, that amphetamine will not appear in a drug test absent metabolism in vivo," and countervailing studies from Arvizu did not support the view that "methamphetamine alone, in vitro and without liver enzymes" can

produce amphetamine. While the trial court acknowledged the root cause of the contamination was not definitively identified, it found BioClean's remediation efforts and the NIST monitoring studies were successful "in reducing . . . any known levels of methamphetamine . . . to the point where there has not been any evidence of contamination there." It further elaborated the discrepant urine sample "anomalous" when considered in the context of "tens of thousands" of non-discrepant test results.

We conclude the trial court did not abuse its discretion in concluding that Abdullahi did not show prejudice requiring exclusion of the test results as unreliable. The Toxicology Lab took many actions to address and mitigate the contamination issue. First, it ceased use of the annex and decommissioned Hood 1 once it discovered further contamination in the main lab. Second, it hired BioClean, a remediation contractor, to conduct multiple rounds of decontamination to more exacting standards, coupled with ongoing monitoring to ensure the effectiveness of decontamination. Finally, the Toxicology Lab had pre-existing protocols that ensured every positive test was followed by confirmatory testing.

In addition to the Laboratory's preventative steps, testimony supported the court's determination that the test results were not so inherently unreliable as to warrant suppression. Although both experts recognized that in vitro metabolization is possible, neither party provided evidence to indicate it could happen spontaneously. Nor did either party present evidence to suggest Abdullahi took amphetamine independently of methamphetamine. Thus, it was reasonable for the court to admit the blood testing results given the absence of any scientific data that "spontaneous" in vitro

24

metabolization could occur or that Abdullahi's blood sample was solely contaminated by methamphetamine.

There was also no evidence of any amphetamine contamination presented below, including evidence that the Crime Lab synthesized or processed amphetamine. Abdullahi relies on the testimony by forensic toxicologist Palen concerning two incidents involving a possible methamphetamine and amphetamine contamination. However, this evidence was not introduced until trial. Because this evidence was not presented at the pretrial hearing, the trial court did not abuse its discretion in failing to consider it when determining that government misconduct did not result in prejudice. See State v. Bluford, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017) ("a judge cannot abuse his or her discretion based on facts that do not yet exist").

Therefore, we hold that the trial court acted within its discretion in finding Abdullahi did not establish actual prejudice warranting dismissal or suppression of the test results under CrR 8.3(b).

C.    Prejudice from Speedy Trial versus Competent Counsel Rights

Abdullahi asserts that under CrR 8.3(b), he can establish prejudice because government mismanagement forced him to choose between his speedy trial rights and effective representation, as he repeatedly had to request to continue his case so he could seek expert assistance and permit his counsel to prepare for the technically complicated methamphetamine contamination issue. Thus, he contends the trial court erred when it found the delays did not constitute prejudice. We disagree.

The ongoing contamination issue was publicly disclosed on August 7, 2020, and subsequent discrepant tests were posted on the lab's publicly accessible website.

25

Abdullahi was arraigned on July 21, 2022, with an initial trial date of September 8, 2022. Over the course of eleven months, the court granted multiple motions to continue from both the State and defense, until Abdullahi's trial commenced on August 7, 2023. Abdullahi's counsel sought continuances to finish interviewing witnesses and to consult with an expert who would assist with the toxicology report. Abdullahi personally objected to three of the continuances his counsel sought on October 6, 2022, December 2, 2022, and April 26, 2023, due to his desire for trial to begin, but the trial court granted the continuances over his objections. Abdullahi remained in custody during this time.

The court found that the State should have disclosed the NIOSH letter as potential impeachment evidence under Brady, but Abdullahi could not establish the materiality prong under Brady, as Abdullahi had been aware of the letter since January 2023. The trial court concluded that

> For the first 6 to 7 months of this case the trial date was continued primarily due [to] the defense's request. . . . With respect to any contamination issue, the defense was already consulting with an expert on January 13, 2023, 'regarding issues at the toxicology laboratory related to methamphetamine contamination.' This procedural posture indicates that the defense was already preparing to criticize the Tox Lab [and] [a]fter the defense discovered . . . the DHHS letter through [] Arvizu, the defense again requested a continuance, this time not objected to by Mr. Abdullahi.

Thus, the trial court found the defense "failed to show any actual prejudice from these continuances."

On appeal, Abdullahi highlights the string of continuances—which, regardless of the reason, did create delay—to argue at a high level he was continually forced to choose between his speedy trial rights and prepared counsel. "A defendant may be impermissibly prejudiced if a late disclosure compels him to choose between his right to a speedy trial and his right to be represented by adequately prepared counsel." State v.

26

Salgado-Mendoza, 189 Wn.2d 420, 436, 403 P.3d 45 (2017). However, even though courts have recognized this dilemma can constitute prejudice under CrR 8.3(b), it is insufficient to lodge such a complaint without further specificity. "[B]ecause the party seeking relief carries the burden of proof, [they] must articulate how the late disclosure materially prejudiced his defense." Id. (citing Rohrich, 149 Wn.2d at 649 (party must show "not merely speculative prejudice but actual prejudice")).[23]

CrR 3.3 governs time-to-trial requirements in Washington. The rule specifies that when "[a] charge not brought to trial within the time limit determined under this rule shall be dismissed with prejudice." CrR 3.3(h). The rule also states that "[n]o case shall be dismissed for time-to-trial reasons except as expressly required by this rule, a statute, or the state or federal constitution." CrR 3.3(h). "[T]his procedural right is not self-executing and requires that a motion be filed to exercise it in accordance with the procedure outlined in the rule." State v. Walker, 199 Wn.2d 796, 804, 513 P.3d 111 (2022); CrR 3.3(d)(3). At trial and on appeal, Abdullahi did not and does not elaborate how CrR 3.3, any statute, or state or federal constitutional right to a speedy trial was violated. See, e.g., State v. Mora-Lopez, 22 Wn. App. 2d 922, 930-33, 514 P.3d 714 (2022) (undertaking a CrR 3.3 analysis in the context of a CrR 8.3(b) motion when considering prejudice). He does not assert a speedy trial violation according to either the Sixth Amendment to the United States Constitution,[24] or article I, section 22 of our state

---

[23] Abdullahi additionally relies on Michielli to support this argument. We find this judicial authority is unavailing, as it preceded our Supreme Court's 2003 amendments to CrR 3.3. Kone, 165 Wn. App. at 435; see State v. George, 160 Wn.2d 727, 737-38, 158 P.3d 1169 (2007) (discussing identical amendments made to CrRLJ 3.3).

[24] A Sixth Amendment right to a speedy trial violation necessitates a two-part inquiry. State v. Iniguez, 167 Wn.2d 273, 283-84, 217 P.3d 768 (2009). First, "a defendant must show that the length of the delay crossed a line from ordinary to presumptively prejudicial." Id. at 283. Second, if the defendant can demonstrate the delay is presumptively prejudicial, this court then examines a non-exclusive, four-factor Barker balancing test to determine if a violation occurred. Id. Those factors include the length of

constitution.[25] Furthermore, he does not claim that he was either completely deprived of counsel,[26] or that his counsel was ineffective.[27]

Further, while Abdullahi assigns error on appeal to the court's finding regarding alleged Brady violations, he does not provide argument regarding this claimed error or explain how, despite what the trial court found was "ample opportunity to work with [his] expert to develop theories about the letter's import," the failure to disclose the June 2022 NIOSH letter earlier prejudiced him. Thus, Abdullahi has waived any challenge to the trial court's conclusions based on a Brady violation. See Smith v. King, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986) ("The basis of this assignment of error is neither stated nor argued, nor is any legal authority bearing on that issue cited. Accordingly, we consider this assignment of error waived.").

We conclude that the trial court did not abuse its discretion in rejecting Abdullahi's claim that delays violated his speedy trial rights and resulted in prejudice to his right to a fair trial. As the court also did not err in concluding the admission of the test results did not cause prejudice, it did not abuse its discretion in denying Abdullahi's CrR 8.3 motion.

III. Cumulative Error

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." State v. Emery,

---

delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Abdullahi did not undertake any portion of this analysis at trial or on appeal.

[25] The analysis is similar under the Washington Constitution. Iniguez, 167 Wn.2d at 290 (" [W]e hold that article I, section 22 requires a method of analysis substantially the same as the federal Sixth Amendment analysis and does not afford a defendant greater speedy trial rights.").

[26] See United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

[27] See Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

174, Wn.2d 741, 766, 278 P.3d 653 (2012) (citing In re Pers. Restraint of Lord,123 Wn.2d 296, 332, 868 P.2d 835 (1994)). Abdullahi argues that the court's rulings admitting his pre-Miranda statements and the toxicology blood test results combined to deny him a fair trial. Because the trial court erred only in one respect, the admission of his pre-Miranda statements, and we determined that error to be harmless, Abdullahi cannot satisfy the requirements of the cumulative error doctrine and is therefore not entitled to a new trial.

IV.    Sentence Exceeding Statutory Maximum

Upon conviction, Abdullahi was sentenced to a 56-month term of incarceration to be followed by 12 months of community custody. He argues this sentence exceeds the statutory maximum and was beyond the court's authority. The State concedes the sentence exceeds the statutory maximum sentence. Thus, we remand the case so the trial court can amend the community custody term.

Felony physical control of a vehicle while under the influence is a class C felony. RCW 46.61.504(6). The statutory maximum sentence for a class C felony is confinement for five years, or 60 months. RCW 9A.20.021(1)(c). Felony physical control of a motor vehicle while under the influence of intoxicating liquor or any drug is also recognized as a "crime against persons." RCW 9.94A.411. Ordinarily, a sentencing court is required to impose one year of community custody if the conviction concerns a "crime against persons." RCW 9.94A.701(3)(a). However, "a court cannot impose an aggregate term of confinement and community custody beyond the statutory maximum." State v. Hernandez, 185 Wn. App. 680, 688, 342 P.3d 820 (2015). RCW 9.94A.701(10) further contemplates "[t]he term of community custody specified by this section shall be

reduced by the court whenever an offender's standard range term of confinement in combination with the term of community custody exceeds the statutory maximum for the crime . . . ."

Abdullahi's sentence exceeds the statutory maximum at 68 months. Thus, the appropriate remedy is to remand for the trial court to amend the term of community custody.

## CONCLUSION

We affirm the conviction and remand to amend the community custody term in the sentence to comply with the statutory maximum sentence.

_Chung, J._

WE CONCUR:

_Birk, J._

_Mann, J._